## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ILAY GORDON, UDAY PARMAR, MAURIE DAIGNEAU, MARIJANA IVEZIC, LILLY CHEUNG, RAJU CHEKKA, and CLAUDE RITZMANN on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>OSTIN TECHNOLOGY GROUP CO., LTD., TAO LING, LAI KUI SEN, QIAOYUN XIE, XIAOHONG YIN, XIAODONG ZHAI, BO YUAN, HEUNG MING WONG, JOHN CARL MEIN, and QIANG HE,<br><br>Defendants. | Case No. 26-cv-1288<br><br>**SHAREHOLDER CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiffs Ilay Gordon, Uday Parmar, Maurie Daigneau, Marijana Ivezic, Lilly Cheung, Raju Chekka, and Claude Ritzmann (collectively "Plaintiffs"), by and through Plaintiffs' counsel, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief are based upon the investigation of Plaintiffs' counsel, which included, among other things, review and analysis of: (1) regulatory filings made by Ostin Technology Group Co., Ltd. ("OST" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (2) wire and press releases published by the Company; (3) analyst and media reports concerning OST; (4) the criminal indictment unsealed by the U.S. Department of Justice on September 12, 2025, charging certain defendants with securities fraud, wire fraud, and conspiracy; (5) discussion with and data collected from a group of more than 235 victims of the fraudulent scheme; and (6) other publicly available information regarding Defendants. Plaintiffs believe that substantial additional

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This securities class action is brought on behalf of a class of all investors who purchased or otherwise acquired OST ordinary shares on the Nasdaq Stock Market (the "Nasdaq") between May 11, 2025, and June 26, 2025, inclusive (the "Class Period"). The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, as well as under 18 U.S. Code § 1964 (civil RICO).

2.      This action arises from a brazen and sophisticated securities fraud—a meticulously orchestrated pump-and-dump scheme that transformed a failing Chinese display manufacturer into a billion-dollar fraud vehicle, artificially inflating OST's stock price by 1,175% over a 73-day period before executing a coordinated dump that obliterated $950 million in market capitalization in a single trading day.

3.      OST is a Cayman Islands corporation with its principal executive offices purportedly in Nanjing, China. OST purports to be a manufacturer of thin-film transistor liquid crystal display ("TFT-LCD") modules and polarizers used in consumer electronics, commercial LCD displays, and automotive displays.

4.      OST's ordinary shares are listed on the Nasdaq under the ticker symbol "OST." All references herein to prices of OST ordinary shares are to prices on the Nasdaq.

5.      From at least on or around December 2024, and continuing throughout the Class Period, the Defendants and their co-conspirators engaged in a multifaceted securities fraud scheme

involving OST which resulted in significant investor losses exceeding $950 million in market capitalization.

6.     On September 12, 2025, the U.S. Department of Justice unsealed a criminal indictment in the Eastern District of Virginia (Case No. 1:25-cr-00259-MSN) charging defendants Lai Kui Sen, OST's co-Chief Executive Officer, and Yan Zhao (operating under aliases including "Hank Shi," "Hank Shu," "Altman," and "Bob"), a financial advisor, with conspiracy to commit securities fraud and wire fraud, securities fraud under Title 18, wire fraud, and securities fraud under Title 15. The indictment alleges that the defendants, along with at least fifteen co-conspirators, orchestrated a scheme that netted over $110 million in illicit proceeds.

7.     Beginning in April 2025, Lai Kui Sen and co-conspirators engineered a fraudulent sequence of securities offerings specifically designed to place the majority of OST shares in the hands of at least fifteen co-conspirators (the "Select Investors") for pennies per share or, in many cases, for no consideration whatsoever.

8.     These securities offerings were synchronized with a fraudulent campaign to artificially inflate the price and trading volume of the OST stock through social media and messaging service applications, including paid promotions that impersonated actual investment advisors and financial professionals. The scheme employed sophisticated tactics including AI-generated deepfake videos, coordinated WhatsApp groups, false acquisition rumors, and guaranteed return promises to lure unsuspecting retail investors.

9.     In a period of roughly two months, the fraudulent promotional campaign artificially inflated the value of OST from an approximately $22 million company (based on a stock price of $0.78 on April 14, 2025) into a greater than $1 billion company by market capitalization (based on a peak stock price of $9.40 on June 26, 2025).

10.     As OST's stock price rose, Yan Zhao and Lai Kui Sen facilitated the opening of brokerage accounts on behalf of co-conspirators, which were used to hold the millions of OST shares that were obtained through non-bona fide securities offerings to the co-conspirators.

11.     At the height of the fraud, the Defendants and their co-conspirators engaged in a massive selloff of their fraudulently obtained securities, obtaining more than $110 million in proceeds from the sale of OST stock which victimized unwitting investors.

12.     On June 26, 2025, OST investors suffered devastating losses when the selloff destroyed over $950 million (representing over 94%) of OST's market capitalization in a single day. The stock plummeted from an intraday high of $9.40 to a closing price of $0.55.

## FACTUAL BACKGROUND

### A.    The Fraudulent Securities Offering

13.     On April 15, 2025, the Company's announced the closing of a $5 million registered direct offering (the "RDO"), including 9,090,908 Class A ordinary shares at $0.55 per share and Class A ordinary share purchase warrants to purchase up to 90,909,080 Class A ordinary shares.

14.     At the time of the RDO, OST's stock was trading at its 52-week low. On April 14, 2025, the last trading day before the RDO closed, OST shares traded between $0.78 and $0.80 per share. The offering price of $0.55 per share represented a discount to the market price of approximately 31.25%.

15.     Lai Kui Sen, the Company's co-Chief Executive Officer, signed the securities purchase agreement on behalf of OST on April 14, 2025. The Prospectus Supplement filed with the SEC on April 15, 2025, was materially misleading by omitting facts material to the investing public, including that Lai Kui Sen and co-conspirators were conspiring on the receipt and

subsequent sale of OST shares obtained through this offering during a campaign to artificially inflate OST's stock price.

16.     The RDO purported to grant each participant in the offering (referred to as "Select Investors") two warrants: one warrant exercisable for five Class A ordinary shares at an exercise price of $0.80 per share, and a second warrant also exercisable for five Class A ordinary shares at the same exercise price. Each of the 18,181,816 warrants issued could be exercised for five additional shares, creating the total potential for 90,909,080 additional shares.

17.     Under the terms of the RDO, the Select Investors obtained OST shares at a deep discount relative to the market price at the time, with the option of purchasing additional shares at an even greater discount through warrant exercises. Factoring in the warrant value, the Select Investors obtained shares at an effective per-share cost of approximately $0.195, which represented an effective discount of more than 80% from OST's closing price of $0.80 on April 14, 2025.

18.     In the accompanying press release issued the same day, the Company touted the offering as providing capital for growth but omitted that the true purpose of the offering was to carry out the fraudulent stock manipulation scheme.

19.     On or about April 16, 2025, Lai Kui Sen signed a SEC Form 6-K, which OST filed and caused to be filed with the SEC via EDGAR. Among other things, the form (i) announced that OST entered into the RDO; and (ii) provided a copy of the April 15, 2025 press release to the SEC. The SEC filing was materially misleading by omitting facts material to the investing public, including that co-conspirators planned to artificially inflate the stock price through fraudulent promotion and systematically dump their holdings on unsuspecting retail investors.

B.    **The Warrant Exchange Agreement**

20.    Between on or about April 15, 2025 and continuing through on or about May 3, 2025, none of the Select Investors elected to exercise even a single purchase warrant, despite the fact that exercising these purchase warrants would have allowed the Select Investors to earn substantial profits by purchasing OST shares at a steep discount relative to the market price and to sell those shares at significantly higher prices. This was because the co-conspirators had a more lucrative arrangement planned.

21.    On or about May 3, 2025, Lai Kui Sen and the Select Investors executed a subsequent "Warrant Exchange Agreement," which further diluted OST's preexisting shareholders and ultimately gave the Select Investors millions of OST shares at no pecuniary cost.

22.    Under the Warrant Exchange Agreement, completed by May 7, 2025:

    a.    All 18,181,816 warrants were exchanged (100% of April warrants);

    b.    70,909,082 Class A ordinary shares were issued in exchange;

    c.    The conversion ratio was approximately 3.9 shares per warrant; and

    d.    The exercise price was zero—co-conspirators paid no cash for over 70 million shares.

23.    At the time of the Warrant Exchange Agreement, OST was trading at approximately $3.12 per share (the closing price on May 2, 2025). The 70,909,082 shares provided to Select Investors therefore had a market value of approximately $221 million—all provided for zero out-of-pocket cost to the Select Investors.

24.    Between the RDO and the Warrant Exchange Agreement, the Select Investors were able to obtain 79,999,990 Class A ordinary shares of OST (9,090,908 from the RDO plus

70,909,082 from the Warrant Exchange) at an average cost of $0.0625 per share (factoring in only the initial $5 million payment across 80 million total shares).

25.     The RDO and Warrant Exchange Agreement raised the total number of outstanding Class A ordinary shares of OST from approximately 27.4 million shares to approximately 107.4 million shares—a dilution of nearly 300%.

26.     Through these offerings, the Select Investors became owners of approximately 75% of the outstanding Class A ordinary shares of OST.

27.     Despite granting the Select Investors the vast majority of OST shares at a fraction of the market price, the terms of the RDO and Warrant Exchange Agreement did not impose any restrictions—such as a stock vesting period or a lock-up period—on the Select Investors' ability to trade their OST shares. Consequently, the Select Investors could sell their shares upon receipt.

28.     On or about May 12, 2025, Lai Kui Sen signed a SEC Form 6-K, disclosing to the SEC the signed Warrant Exchange Agreement, and OST filed and caused to be filed the same with the SEC via EDGAR. The filing disclosed that the total number of outstanding Class A ordinary shares was 108,130,032. The filing was materially misleading by omitting facts material to the investing public, including, among other things, that (a) Lai Kui Sen, Yan Zhao, and other Select Investors were conspiring on the receipt and subsequent sale of OST shares obtained through the RDO and the Warrant Exchange Agreement during a campaign to artificially inflate OST's stock price; and (b) Yan Zhao and Lai Kui Sen were conspiring to assist co-conspirators with setting up brokerage accounts to eventually dump OST shares obtained as part of the RDO and Warrant Exchange Agreement.

29.     The RDO and Warrant Exchange Agreement operated as deceptive devices that were used in furtherance of the conspiracy and directly violated the federal securities laws.

C.    **The Fraudulent Promotional Campaign**

30.    At least as early as on or about May 11, 2025, a fraudulent campaign to promote OST and increase its stock price began. The synchronization of the securities offerings with the promotional campaign demonstrates the premeditated nature of the scheme.

31.    The fraudulent promotional campaign employed multiple sophisticated tactics designed to create artificial demand for OST stock and lure retail investors:

32.    Promoters created fake profiles using real investment advisors' names, photographs, and credentials stolen from SEC/FINRA-registered firms. They provided different contact information than the real advisors, directing victims to WhatsApp groups with names designed to appear legitimate, such as "Karen Finerman's Free Exchange Group Sharing" (named after a real CNBC personality).

33.    Scammers deployed sophisticated AI-generated videos featuring prominent figures including Goldman Sachs Chief Strategist David Kostin, Israeli Prime Minister Benjamin Netanyahu, actress Gal Gadot, Elon Musk, Mark Zuckerberg, and author Tim Ferriss. These deepfakes appeared after clicking sponsored Instagram or Facebook advertisements.

34.    WhatsApp groups, some containing hundreds of members, received daily instructions such as: "Today we focus on OST, buy between $4.50-$5.00 and hold." The scammers, posing as other investors, touted the amounts they had purchased to generate a sense of legitimacy and peer pressure for victims to follow suit. Members expressing skepticism were immediately removed from groups to maintain a false consensus of enthusiasm.

35.    Promoters spread fabricated stories that "a major OLED display company" would acquire OST at substantial premiums, which they supported with a 20-page report purporting to

analyze the global and Chinese markets for OST's products. The acquisition rumors had zero factual basis but created urgency and fear of missing out (FOMO) among retail investors.

36.     Promoters promised extravagant and guaranteed returns, including "15-25% weekly returns," "80-150% gains within 4-6 weeks," and characterized OST as a "high-yield elite core investment" with profits "up to 300%." These promises violated basic securities laws prohibiting guaranteed return representations and were designed to overcome investors' natural skepticism.

37.     Multiple victims reported that promoters first recommended legitimate stocks that generated small profits, establishing credibility before pivoting to OST. This "bait and switch" tactic was designed to lower victims' defenses and establish the promoters as trustworthy sources of investment advice.

38.     As a result of the fraudulent promotional campaign, OST's stock price increased dramatically despite massive dilution that would ordinarily cause the stock price to decline. Dilutive offerings of the magnitude executed by OST typically depress stock prices, as the same company value is spread across far more shares. The fact that OST's stock price surged during this extreme dilution is powerful evidence of artificial manipulation.

### D.    The Rapid Price Increase

39.     Between April 14, 2025, and June 26, 2025, OST's stock price increased 1,175%— from a closing price of $0.78 on April 14, 2025, to a peak price of $9.40 on June 26, 2025. This unprecedented price increase occurred despite:

          a.     Massive dilution of 80 million new shares flooding the market (nearly 300% dilution);

     b.      No material corporate developments, earnings surprises, major contract wins, or technological breakthroughs;

     c.      Continued fundamental weakness (declining revenues of $38 million annually, mounting losses of $10.6 million, negative 27% profit margin, and debt-to-equity ratio of 9.5);

     d.      Complete absence of institutional buying interest (institutional ownership remained at 0.1%); and

     e.      Chronic financial distress requiring multiple reverse stock splits.

40.     The market capitalization of OST exploded from approximately $22 million to over $1 billion at peak—a 4,445% increase—making OST one of the most-traded stocks on stock-trading platforms including Hargreaves Lansdown, Trading 212, and AJ Bell despite its microscopic actual business operations.

41.     During the period of drastic price increase, OST did not announce any significant news events that would typically result in a sharp increase in a company's stock, such as a strong earnings announcement, merger announcement, major customer wins, technological breakthroughs, or expansion into new markets.

42.     The campaign achieved remarkable geographic reach, with victims spanning the United States, the United Kingdom, Germany, Israel, Canada, and Italy, among others.

**E.      Brokerage Account Facilitation**

43.     Beginning in or around December 2024, Yan Zhao, claiming to be a financial advisor, started cultivating relationships with brokers based in the United States, including brokers at brokerage firms located in New Jersey and New York.

44.    Yan Zhao had previously used these same brokers to facilitate sales of other pump-and-dump schemes involving at least two other Chinese companies (referred to in the criminal indictment as "Public Company A" (on information and belief, China Liberal Education Holdings Ltd. or "CLEU") and "Public Company B" (on information and belief, Jayud Global Logistics Ltd. or "JYD")), whose stocks also crashed after Zhao directed sales through these brokers—establishing a pattern of serial fraud.

45.    Sometime after May 11, 2025, Yan Zhao introduced brokers to certain co-conspirators, including those identified in the criminal indictment as CC-1, CC-2, CC-3, and CC-4, for the purpose of opening brokerage accounts to hold and sell OST shares.

46.    As part of the account opening process, brokers requested formal confirmation from OST management regarding the authenticity of the shares to be deposited into the accounts. Lai Kui Sen provided this confirmation, sending emails to brokers confirming that the co-conspirators were "shareholders" of OST who had "participated in the registered direct offering" and stating that their shares were "non-restricted."

47.    On or about April 25, 2025, Lai Kui Sen sent an email to a broker stating: "[CC-2] and [CC-1] are both take part into [sic] registed [sic] direct offering of my company Ostin Technology Ltd. Both guy's [sic] shares is non restricted. Here I recommend them to open brokerage account at your side. Please proceed it. If you have any additional question [sic] please let me know."

48.    On or about May 12, 2025, after the Warrant Exchange Agreement closed, Lai Kui Sen sent an email to a broker stating: "Out [sic] company now outstanding share [sic] is 108,130,032. Please see screenshot from transfer agent. Any question please let me know without any hesitate [sic]."

49.     On or about June 2, 2025, well into the fraudulent campaign to artificially inflate the OST share price, Lai Kui Sen falsely represented in writing to brokers that certain co-conspirators were not affiliated persons of OST—meaning they were not officers, directors, or beneficial owners of more than 5% of OST's shares. This representation was materially false given the co-conspirators' ownership of approximately 75% of OST's outstanding shares and their coordinated role in the fraudulent scheme.

50.     In repeatedly working together to facilitate brokerage account openings and to provide false assurances to brokers, Yan Zhao and Lai Kui Sen conspired to create the financial infrastructure necessary to receive the proceeds of fraud and effectuate the securities and wire fraud scheme.

**F.     The Coordinated Stock Dump**

51.     After securing brokerage accounts, the co-conspirators executed systematic sales of their fraudulently obtained shares as OST's stock price rose due to the fraudulent promotional scheme.

52.     The following sales were documented in the criminal indictment:

**CC-4 SALES**:

    a.     On or about May 2, 2025, CC-4 deposited 363,636 OST shares obtained via the RDO into a brokerage account.

    b.     On or about May 12, 2025, CC-4 sold all 363,636 shares, generating proceeds of approximately $1,509,089.

**CC-1 SALES**:

    c.     On or about May 5, 2025, CC-1 deposited 363,636 OST shares obtained via the RDO into a brokerage account.

d.      On or about May 12, 2025, CC-1 sold all 363,636 shares, generating proceeds of approximately $1,495,137.

e.      On or about May 13, 2025, CC-1 deposited 2,836,361 OST shares obtained through the Warrant Exchange Agreement.

f.      Between May 15, 2025, and June 10, 2025, CC-1 sold 2,027,134 of these shares, generating proceeds of approximately $10,117,023.

g.      After the crash, CC-1 sold the remaining 809,227 shares for approximately $372,438.

h.      Total proceeds for CC-1: approximately $11,984,598.

**CC-2 SALES:**

i.      On or about May 5, 2025, CC-2 deposited 436,364 OST shares obtained via the RDO into a brokerage account.

j.      On or about May 12, 2025, CC-2 sold all 436,364 shares, generating proceeds of approximately $1,770,596.

**CC-3 SALES:**

k.      On or about May 9, 2025, CC-3 deposited 854,545 OST shares obtained via the RDO into a brokerage account.

l.      Between May 12, 2025, and May 16, 2025, CC-3 sold all 854,545 shares, generating proceeds of approximately $3,600,716.

m.      On or about May 16, 2025, CC-3 deposited 6,665,451 OST shares obtained through the Warrant Exchange Agreement.

n.      Between May 19, 2025, and June 24, 2025, CC-3 sold 3,908,616 shares, generating proceeds of approximately $23,749,959.

o.      Total proceeds for CC-3: approximately $27,350,675.

53.    The foregoing sales were made in coordination with the fraudulent promotional campaign and were designed to take advantage of the price inflation resulting from that campaign.

54.    The four co-conspirators identified above alone generated total proceeds of approximately $43.2 million from the sale of fraudulently obtained OST shares. With at least fifteen Select Investors participating in the scheme, and total proceeds exceeding $110 million as stated in the criminal indictment, it is evident that the remaining co-conspirators also engaged in systematic sales of their fraudulently obtained shares. To obscure and attempt to abscond with the proceeds of the fraud, co-conspirators employed sophisticated money laundering tactics:

a.      Immediately after selling OST shares, co-conspirators purchased U.S. Treasury ETFs (including USFR, TFLO, and SHV) with the proceeds;

b.      Co-conspirators then transferred these securities to accounts at a Hong Kong-based brokerage firm; and

c.      CC-1, CC-2, CC-3, and CC-4 maintained virtually identical account balances in their Hong Kong accounts during April 2025, providing evidence of centralized control and coordination.

**G.      The Stock Price Crash**

55.    On the morning of June 26, 2025, OST touched its peak price of $9.40 per share. Within hours, a coordinated selloff by co-conspirators triggered one of the most catastrophic single-day collapses in recent NASDAQ history.

56.    OST closed at $0.55 per share on June 26, 2025—a 94.1% intraday decline from the $9.40 peak. The market capitalization loss exceeded $950 million in a single trading session.

57.    Trading volume on June 26, 2025, was 34.55 million shares—more than 5 times the average daily volume of 6.07 million shares—demonstrating the massively coordinated selling by co-conspirators.

58.    The crash caught retail investors completely unprepared. Many had been instructed by WhatsApp groups to "hold until July 4" to maximize gains. Stop-loss orders failed to execute due to rapid price gaps and thin liquidity—the stock simply gapped down through stop-loss triggers, leaving investors unable to exit positions.

59.    On June 27, 2025, OST issued a press release stating the company had "no undisclosed material matters, nor is it aware of the specific reasons for the abnormal stock price fluctuations on June 26." The company cautioned investors to "rely solely on statements and filings with the U.S. Securities and Exchange Commission issued by the Company itself or its authorized representatives"—effectively disclaiming responsibility for the social media promotion that had driven the stock to absurd heights while omitting any disclosure of the fraudulent scheme.

60.    The stock continued to deteriorate:

    a.    June 27, 2025: Opened at $0.45, fell to $0.35

    b.    July 3, 2025: $0.16 (98.3% decline from peak)

    c.    August 2025: Bottomed at $0.08 (99.1% decline from peak)

61.    In a desperate attempt to avoid delisting from NASDAQ for failing to maintain the minimum $1.00 bid price, OST announced a 1-for-25 reverse stock split on July 18, 2025, effective August 5, 2025—OST's second reverse split in eight months, following a 1-for-10 reverse split on December 26, 2024.

H.    **The Criminal Charges**

62.    On September 12, 2025, the U.S. Department of Justice unsealed a criminal indictment in the United States District Court for the Eastern District of Virginia (Case No. 1:25-cr-00259-MSN) charging Yan Zhao and Lai Kui Sen with four counts:

a.    Count One: Conspiracy to Commit Securities Fraud and Wire Fraud (18 U.S.C. § 1349) - maximum 20 years in prison;

b.    Count Two: Securities Fraud under Title 18 (18 U.S.C. §§ 1348(1) & 2) - maximum 25 years in prison;

c.    Count Three: Wire Fraud (18 U.S.C. §§ 1343 & 2) - maximum 20 years in prison; and

d.    Count Four: Fraud in Connection with Purchase and Sale of Securities under Title 15 (15 U.S.C. §§ 78j(b) & 78ff(a); 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2) - maximum 20 years in prison.

63.    The indictment alleges that from December 2024 through August 2025, the defendants orchestrated the fraudulent scheme described herein.

64.    The investigation was conducted by the Federal Bureau of Investigation ("FBI") Washington Field Office Criminal Division and the SEC Office of Inspector General ("SEC-OIG"), with referral from FINRA's Surveillance and Market Intelligence – Market Abuse Group.

65.    The U.S. Department of Justice has seized nearly $10 million in assets from co-conspirators' accounts—a fraction of the $110 million in known proceeds from the fraudulent scheme—including:

a.    53,800 shares of USFR (Treasury ETF)

b.    39,500 shares of TFLO (Treasury ETF)

      c.      37,100 shares of SHV (Treasury ETF)

      d.      Cash balances totaling approximately $952,150

**I.**      <u>**The NASDAQ Trading Halt**</u>

66.      On September 12, 2025, at 12:24:23 PM Eastern Time, NASDAQ halted trading of OST shares following the unsealing of the criminal indictment. The last trade price before the halt was $1.695 (adjusted for the 1-for-25 reverse split), or less than $0.07 per share on a pre-reverse split basis.

67.      NASDAQ issued a formal request requiring OST to provide all information and documents related to the criminal indictment, complete SEC filings and public disclosures, and results of any internal investigation.

68.      Trading remains halted indefinitely as of the filing of this Complaint, pending OST's full response to NASDAQ's information requests and NASDAQ's determination of whether OST meets continued listing standards.

69.      On September 12, 2025, OST announced the formation of a Special Committee of independent directors to engage outside counsel and conduct an independent internal investigation into the allegations. The company stated it is "conferring with counsel regarding the removal or suspension of Mr. [Lai Kui] Sen as Co-Chief Executive Officer and director of the Company."

**J.**      <u>**Catastrophic Investor Losses**</u>

70.      The fraud generated over $110 million in illicit proceeds for defendants and co-conspirators, as documented through brokerage records subpoenaed by federal investigators.

71.      Retail investors suffered catastrophic losses:

      a.      $950 million in market capitalization obliterated on June 26, 2025 alone (94% of peak value);

b.      Thousands of victims across multiple countries;

c.      Individual losses ranging from $7,000 to more than $1,000,000, with many losing life savings and children's college funds.

72.     The fraud was part of a broader wave of Chinese micro-cap manipulations in 2025, with at least four similar schemes (involving companies identified in public reports as CLEU, JYD, PTHL, and PHH) following identical patterns and collectively costing investors over $1 billion.

## JURISDICTION AND VENUE

73.     The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), and 18 U.S.C. § 1964 (civil RICO).

74.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

75.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(c). A substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred in this District. OST's securities trade on NASDAQ, which is headquartered in New York. Many of the false and misleading statements complained of herein were disseminated from or into this District. Defendants conducted business in this District and have substantial contacts with this District.

76.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, the internet, and the facilities of a national securities exchange.

## PARTIES

77.    Plaintiff Ilay Gordon resides in Israel. He purchased OST shares beginning on May 16, 2025, as reflected in the attached certification, leading to losses of more than $67,000.

78.    Plaintiff Uday Parmar is a Canadian investment consultant. Parmar purchased shares of OST beginning on May 19, 2025, as reflected in the attached certification. He lost approximately $43,000 in the OST Scheme.

79.    Plaintiff Maurie Daigneau is a retired entrepreneur residing in Wisconsin. Daigneau purchased OST shares beginning on June 10, 2025, as reflected in the attached certification. Daigneau lost more than $240,000, with nearly $476,000 in additional losses as a result of purchases he made on behalf of his wife.

80.    Plaintiff Marijana Ivezic is Croat national living in Germany. Ivezic purchased shares of OST beginning on May 14, 2025, as reflected in the attached certification. She suffered losses of approximately $10,000.

81.    Plaintiff Lilly Cheung lives in the Netherlands. Cheung purchased shares of OST beginning on May 12, 2025, as reflected in the attached certification. She lost more than $175,000, with approximately $14,000 in additional losses from purchases made on behalf of her husband.

82.    Plaintiff Raju Chekka is an investor who is a citizen and resident of Canada who was misled by the false or misleading statements of the Defendants and suffered more than $375,000 in losses as a result of the Scheme, as reflected in the attached certification.

83.    Plaintiff Claude Ritzmann is an investor who is a citizen and resident of Switzerland who was misled by the false and misleading statements of the Defendants and suffered more than $820,000 in losses as a result of the Scheme, as reflected in the attached certification.

84.    Defendant Ostin Technology Group Co., Ltd. ("OST") is a Cayman Islands corporation with its principal executive offices purportedly located in Nanjing, Jiangsu Province, People's Republic of China. OST's Class A ordinary shares trade on the NASDAQ Capital Market under the ticker symbol "OST" (CUSIP: G67927122 after the August 5, 2025 reverse split; previously CUSIP: G67927114). OST purports to be engaged in the design, development, and manufacture of thin-film transistor liquid crystal display ("TFT-LCD") modules and polarizers for use in consumer electronics, commercial LCD displays, and automotive displays. OST was founded in 2010 and went public through an initial public offering in March 2021. OST operates through a Variable Interest Entity ("VIE") structure, with a British Virgin Islands holding entity (Ostin Technology Holdings Limited) owning a Hong Kong subsidiary (Ostin Technology Limited), which in turn holds contracts with Chinese operating entities in Nanjing, primarily Jiangsu Austin Optronics Technology Co., Ltd.

85.    Defendant Tao Ling has served as a member of OST's Board of Directors (the "Board") since the Company's inception, as Chairman of the Board since June 2020, and as Chief Executive Officer (later co-Chief Executive Officer) since June 2020. Mr. Ling has also served as Chairman of Jiangsu Austin Optronics Technology Co., Ltd. ("Jiangsu Austin"), OST's primary operating subsidiary in China, since December 2010. During the Class Period, Mr. Ling possessed the power and authority to control the contents of OST's SEC filings, press releases, and other public statements. Mr. Ling signed OST's annual reports on Form 20-F filed with the SEC. As a senior executive and Chairman of the Board, Mr. Ling was involved in managing OST's business and operations and was privy to confidential information concerning, among other things, OST's financial condition, operations, business, and future prospects. Because of his position with the Company, Mr. Ling had access to material non-public information about OST's business, finances,

operations, and future prospects, including the fraudulent nature of the securities offerings and the artificial manipulation of OST's stock price.

86.    Defendant Lai Kui Sen has served as OST's co-Chief Executive Officer and as a director since in or around January 2025. As co-Chief Executive Officer, Mr. Sen possessed authority over OST's business operations and strategic direction. Mr. Sen signed the securities purchase agreement for the April 15, 2025 registered direct offering on behalf of OST. Mr. Sen signed the Warrant Exchange Agreement on behalf of OST. Mr. Sen signed SEC Forms 6-K filed on April 16, 2025, and May 12, 2025, which disclosed the fraudulent securities offerings. Mr. Sen sent multiple emails to U.S.-based brokers facilitating the opening of brokerage accounts for co-conspirators and falsely representing that co-conspirators were not affiliated persons of OST. On September 10, 2025, the U.S. Department of Justice charged Mr. Sen in a criminal indictment with conspiracy to commit securities fraud and wire fraud, securities fraud, wire fraud, and fraud in connection with the purchase and sale of securities, alleging that he orchestrated the pump-and-dump scheme involving OST stock. Because of his position with the Company and his direct involvement in the fraudulent scheme, Mr. Sen had access to material non-public information about OST's business, finances, operations, and future prospects, including the fraudulent nature of the securities offerings and the artificial manipulation of OST's stock price.

87.    Defendant Qiaoyun Xie has served as OST's Chief Financial Officer since June 2020. As CFO, Ms. Xie was responsible for OST's financial reporting, investment activities, and financial policies. Ms. Xie signed OST's annual reports on Form 20-F filed with the SEC, including certifications pursuant to the Sarbanes-Oxley Act of 2002 attesting to the accuracy of OST's financial statements. Because of her position as CFO, Ms. Xie had access to material non-public information about OST's business, finances, operations, and future prospects, including

information regarding the Company's securities offerings, share issuances, and dilution. Ms. Xie knew or recklessly disregarded that the RDO and Warrant Exchange Agreement were non-bona fide transactions designed to facilitate the fraudulent pump-and-dump scheme.

88.    Defendant Xiaohong Yin has served as a director of OST since June 2020. Mr. Yin has also served as director and General Manager of Jiangsu Austin since January 2011, where he is responsible for production, quality control, after-sale services, and sales activities. As a director of OST during the Class Period, Mr. Yin had the power and authority to control the Company's business and operations. Mr. Yin participated in or was privy to discussions and decisions concerning OST's business, operations, financial condition, and future prospects, including the securities offerings that formed the basis of the fraudulent scheme. Because of his positions as director of OST and General Manager of Jiangsu Austin, Mr. Yin had access to material non-public information about OST's business, finances, operations, and future prospects.

89.    Defendant Xiaodong Zhai has served as OST's Chief Technology Officer since June 2021. As CTO, Mr. Zhai was responsible for overseeing OST's technological development and operations. During the Class Period, Mr. Zhai possessed the authority to control or influence OST's business operations and was privy to confidential information concerning the Company's business and operations. Because of his position as a senior executive officer, Mr. Zhai had access to material non-public information about OST's business, finances, operations, and future prospects.

90.    Defendant Bo Yuan has served as OST's Secretary since June 2021. Mr. Yuan has also served as Secretary of the Board of Directors and Deputy General Manager of Jiangsu Austin since April 2015, where he is responsible for Jiangsu Austin's strategic decisions, investment, financing, and securities affairs. As Secretary of OST and Jiangsu Austin, Mr. Yuan was directly involved in the Company's securities offerings and corporate governance matters during the Class

Period. Mr. Yuan knew or should have known about the material terms and circumstances surrounding the RDO and Warrant Exchange Agreement. Because of his positions, Mr. Yuan had access to material non-public information about OST's business, finances, operations, and future prospects, including information regarding the securities offerings.

91.    Defendant Heung Ming Wong has served as a director of OST during the Class Period. As a director, Mr. Wong owed fiduciary duties to OST shareholders and had the power and authority to control the Company's business and operations. Mr. Wong participated in or was privy to discussions and decisions concerning OST's business, operations, financial condition, and future prospects, including the securities offerings that formed the basis of the fraudulent scheme. Through his role as a director, Mr. Wong had access to material non-public information about OST's business, finances, operations, and future prospects.

92.    Defendant John Carl Mein has served as a director of OST since April 2022. As a director, Mr. Mein owed fiduciary duties to OST shareholders and had the power and authority to control the Company's business and operations. Mr. Mein participated in or was privy to discussions and decisions concerning OST's business, operations, financial condition, and future prospects, including the securities offerings that formed the basis of the fraudulent scheme. Through his role as a director, Mr. Mein had access to material non-public information about OST's business, finances, operations, and future prospects.

93.    Defendant Qiang He has served as a director of OST during the Class Period. As a director, Mr. He owed fiduciary duties to OST shareholders and had the power and authority to control the Company's business and operations. Mr. He participated in or was privy to discussions and decisions concerning OST's business, operations, financial condition, and future prospects, including the securities offerings that formed the basis of the fraudulent scheme. Through his role

as a director, Mr. He had access to material non-public information about OST's business, finances, operations, and future prospects.

94.    Defendants Tao Ling, Lai Kui Sen, Qiaoyun Xie, Xiaohong Yin, Xiaodong Zhai, Bo Yuan, Heung Ming Wong, John Carl Mein, and Qiang He are collectively referred to herein as the "Individual Defendants."

95.    Each of the Individual Defendants:

a.    Directly participated in the management and day-to-day operations of the Company and/or its subsidiaries at the highest levels;

b.    Was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business and operations;

c.    Was involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein;

d.    Was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company;

e.    Approved or ratified these statements in violation of the federal securities laws; and/or

f.    Was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.

96.    As officers, directors, and controlling persons of a publicly held company whose common stock was registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's

financial condition, business, operations, management, and future prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

97.    The Individual Defendants are liable as direct participants in the wrongs complained of herein.

## SUBSTANTIVE ALLEGATIONS

### A.    Background on OST

98.    OST is a Cayman Islands corporation that purports to design, develop, and manufacture TFT-LCD modules and polarizers used in consumer electronics, commercial LCD displays, and automotive displays. The Company was founded in 2010 and completed an initial public offering on NASDAQ in March 2021, offering 3.375 million ordinary shares at $4.00 per share and raising approximately $14 million.

99.    OST operates through a Variable Interest Entity (VIE) structure—a complex corporate arrangement commonly used by Chinese companies to access U.S. capital markets while circumventing Chinese ownership restrictions. Under OST's VIE structure: (a) the Cayman Islands parent company (Ostin Technology Group Co., Ltd.) controls a British Virgin Islands holding entity (Ostin Technology Holdings Limited); (b) which owns a Hong Kong subsidiary (Ostin Technology Limited); (c) which in turn holds contracts with Chinese operating entities in Nanjing, primarily Jiangsu Austin Optronics Technology Co., Ltd., founded in 2010.

100.    This layered structure creates opacity that, as alleged herein, Defendants exploited to conceal their fraudulent scheme.

**B.**    **OST's Financial Distress Prior to the Fraud**

101.    By 2024, OST exhibited severe financial distress, making it an ideal vehicle for a pump-and-dump fraud. Among other issues, OST had:

        a.    Annual revenues of just $38 million against a net loss of $10.6 million (negative 27% profit margin);

        b.    Debt-to-equity ratio of 9.5, indicating the Company was highly leveraged and financially unstable;

        c.    Institutional ownership of merely 0.1%—a clear signal that sophisticated investors with research resources had avoided or abandoned the stock;

        d.    Chronic NASDAQ compliance issues, including failure to maintain the minimum $1.00 bid price; and

        e.    Multiple reverse stock splits to avoid delisting (1-for-10 reverse split on December 26, 2024; 1-for-25 reverse split on August 5, 2025).

102.    By late 2024, OST had withdrawn from standard SEC quarterly reporting obligations, filing only annual reports on Form 20-F—reducing transparency at the precise moment conspirators were planning their fraud.

103.    In July 2024, NASDAQ issued a deficiency notice to OST for failing to maintain the minimum $1.00 bid price requirement, granting the Company a 180-day compliance period until January 13, 2025.

104.    By April 14, 2025, OST's stock had fallen to its 52-week low of $0.78-$0.80 per share, with a market capitalization of approximately $22 million. This financial distress made OST an ideal target for manipulation—the stock had nowhere to go but up (if artificially pumped), and any dilution could be masked by fraudulent promotion.

C.    **Defendants' Materially False and Misleading Statements**

105.    The fraudulent scheme described herein was effectuated through a series of materially false and misleading statements and omissions in OST's SEC filings, press releases, and communications to brokers and investors.

106.    On April 15, 2025, OST filed a Prospectus Supplement with the SEC disclosing the terms of the registered direct offering, which included:

a.    9,090,908 Class A ordinary shares at $0.55 per share;

b.    18,181,816 warrants exercisable for up to 90,909,080 Class A ordinary shares; and

c.    Gross proceeds of $5 million.

107.    The offering was conducted pursuant to a shelf registration statement on Form F-3 (File No. 333-279177) previously filed and declared effective by the SEC on May 28, 2024.

108.    The Prospectus Supplement was materially false and misleading because it omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading. Specifically, the Prospectus Supplement omitted the following facts:

a.    the offering was non-*bona fide* and designed to place the majority of OST shares in the hands of co-conspirators for the purpose of executing a pump-and-dump scheme;

b.    co-CEO Lai Kui Sen and the Select Investors were conspiring to artificially inflate OST's stock price through fraudulent social media promotion;

c.    the Select Investors planned to systematically dump their shares at inflated prices, defrauding retail investors;

d.    a fraudulent promotional campaign would launch the same day as the offering closed, demonstrating premeditated coordination; and

e.    the offering was structured to dilute existing shareholders massively while providing insiders with shares at pennies per share that could be immediately sold for enormous profits.

109.    On April 15, 2025, OST issued a press release announcing the closing of the registered direct offering. The press release stated that the offering would provide capital for the Company's growth and operations.

110.    This statement was materially false and misleading because it omitted that the true purpose of the offering was to carry out a fraudulent stock manipulation scheme. The offering was not designed to raise capital for legitimate business purposes but rather to distribute shares to co-conspirators who would dump them at artificially inflated prices.

111.    On April 16, 2025, OST filed a Form 6-K with the SEC, signed by co-CEO Lai Kui Sen, announcing that OST had entered into the registered direct offering and providing a copy of the April 15, 2025 press release.

112.    This Form 6-K was materially false and misleading for the same reasons as the Prospectus Supplement and the April 15, 2025 press release. It omitted disclosure of the fraudulent nature of the offering and the coordinated plan to artificially inflate and dump OST stock.

113.    On May 12, 2025, OST filed a Form 6-K with the SEC, signed by co-CEO Lai Kui Sen, disclosing the Warrant Exchange Agreement dated May 3, 2025.

114.    The Form 6-K disclosed that:

a.    OST and the Select Investors had agreed to exchange all 18,181,816 outstanding warrants for an aggregate of 70,909,082 Class A ordinary shares;

b.      The total number of Class A ordinary shares outstanding would increase to 108,130,032; and

c.      The warrant exchange was completed without any cash payment from the Select Investors.

115.    This Form 6-K was materially false and misleading because it omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading. Specifically, the Form 6-K omitted the following facts:

a.      co-CEO Lai Kui Sen, Yan Zhao, and the Select Investors were conspiring to artificially inflate OST's stock price through fraudulent promotion;

b.      the Select Investors had received over 70 million shares for zero consideration as part of a coordinated pump-and-dump scheme;

c.      Yan Zhao and Lai Kui Sen were conspiring to assist co-conspirators with setting up brokerage accounts to dump OST shares;

d.      the massive 300% dilution was being masked by a fraudulent promotional campaign designed to artificially inflate the stock price; and

e.      the warrant exchange was structured specifically to avoid any cash payment, allowing co-conspirators to obtain shares for free and immediately sell them at artificially inflated prices for pure profit.

116.    This wire transmission of the Form 6-K through the SEC's EDGAR system formed the basis for Count Three of the criminal indictment (wire fraud), as the transmission occurred between the Eastern District of Virginia (where SEC servers are located) and locations outside of Virginia.

117.    On June 27, 2025, following the 94% stock price crash on June 26, 2025, OST issued a statement claiming the Company had "no undisclosed material matters" and was "not aware of the specific reasons for the abnormal stock price fluctuations on June 26."

118.    This statement was materially false and misleading because OST's co-CEO Lai Kui Sen was directly involved in orchestrating the pump-and-dump scheme that caused the stock price to artificially inflate and then crash. OST did have undisclosed material matters—specifically, the fraudulent securities offerings, the artificial manipulation campaign, and the coordinated selling by co-conspirators that caused the crash.

119.    Throughout the Class Period, Defendants failed to disclose material adverse facts about the Company's business and operations, including:

    a.    the April 15, 2025 registered direct offering and May 3, 2025 Warrant Exchange Agreement were non-bona fide securities transactions designed to dilute ownership for the benefit of co-conspirators;

    b.    the Select Investors obtained approximately 80 million OST shares (75% of the Company's outstanding shares) for an average cost of $0.0625 per share through fraudulent means;

    c.    the promotional campaign utilizing social media, WhatsApp groups, impersonation of investment advisors, and AI-generated deepfake videos was fraudulent and designed to artificially inflate OST's stock price;

    d.    Defendants had coordinated the opening of brokerage accounts to facilitate the systematic dumping of fraudulently obtained shares at inflated prices;

    e.    the Company's SEC filings, including the Prospectus Supplement and Forms 6-K, omitted material facts about the conspiracy;

       f.     the stock price increase from $0.78 on April 14, 2025, to $9.40 on June 26, 2025 (a 1,175% increase) was artificial and unsustainable, driven entirely by fraudulent manipulation rather than any legitimate business developments;

       g.     co-conspirators were systematically selling their fraudulently obtained shares throughout May and June 2025, generating over $110 million in illicit proceeds;

       h.     OST's co-CEO Lai Kui Sen was directly orchestrating the fraudulent scheme and would eventually be criminally charged by the U.S. Department of Justice.

### D.    **The Stock Price Collapses as The Scam Is Revealed**

120.    On June 26, 2025, OST's stock price crashed from an intraday high of $9.40 to a closing price of $0.55—a 94% decline in a single day. Over $950 million in market capitalization was obliterated as co-conspirators completed their coordinated dump of fraudulently obtained shares.

121.    The crash revealed to investors that OST's stock price had been artificially inflated through manipulation in support of a pump-and-dump scheme, rather than reflecting any legitimate business value.

122.    On July 18, 2025, OST received a grand jury subpoena from the U.S. Attorney for the Eastern District of Virginia requesting documents and communications related to the registered direct offering, the Warrant Exchange Agreement, communications with Select Investors, brokerage account facilitation, and stock promotional activities.

123.    The Company disclosed receipt of the subpoena in SEC filings, confirming that federal authorities were investigating the circumstances surrounding the April and May securities offerings and the June stock price crash.

124. On September 12, 2025, the U.S. Department of Justice unsealed a criminal indictment in the Eastern District of Virginia charging OST's co-CEO Lai Kui Sen and financial advisor Yan Zhao with conspiracy to commit securities fraud and wire fraud, securities fraud, wire fraud, and fraud in connection with the purchase and sale of securities.

125. The indictment alleged that beginning in December 2024 and continuing through August 2025, Lai Kui Sen, Yan Zhao, and at least fifteen co-conspirators orchestrated a pump-and-dump scheme involving OST stock that netted over $110 million in illicit proceeds while causing investors to lose over $950 million.

126. The indictment confirmed that the April 15, 2025 registered direct offering and May 3, 2025 Warrant Exchange Agreement were non-bona fide securities transactions designed to place the majority of OST shares in the hands of co-conspirators for pennies per share or for no consideration.

127. The indictment confirmed that a fraudulent promotional campaign began on May 11, 2025—just after the registered direct offering closed—utilizing social media, impersonation of investment advisors, and other deceptive tactics to artificially inflate OST's stock price.

128. The indictment confirmed that Lai Kui Sen and Yan Zhao facilitated the opening of brokerage accounts for co-conspirators and orchestrated the systematic selling of fraudulently obtained shares at artificially inflated prices.

129. The indictment confirmed that co-conspirators generated over $110 million in proceeds from the sale of fraudulently obtained OST shares.

130. Following the unsealing of the indictment, NASDAQ immediately halted trading of OST shares pending the Company's response to a request for information regarding the indictment, SEC filings, and public disclosures.

131.    As a result of the criminal indictment, investors realized that the securities offerings were fraudulent, that the stock price increase had been artificially manipulated, and that OST's business had no legitimate value justifying even a fraction of the stock prices at which they had purchased shares during the Class Period.

E.    **Defendants' Scienter**

132.    During the Class Period, as alleged herein, Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements they issued or disseminated to the investing public, or caused to be issued or disseminated, were materially false and misleading. Defendants knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding OST, their control over and/or receipt and/or modification of OST's allegedly materially misleading statements and documents, and/or their positions with the Company which made them privy to confidential proprietary information concerning OST, participated in the fraudulent scheme alleged herein.

133.    Defendant Lai Kui Sen, as co-CEO of OST, directly orchestrated and executed the fraudulent scheme. Without limitation, Lai Kui Sen:

a.    Signed the securities purchase agreement for the April 15, 2025 registered direct offering on behalf of OST;

b.    Signed the Warrant Exchange Agreement on behalf of OST;

c.    Signed SEC Forms 6-K filed on April 16, 2025, and May 12, 2025, which omitted material facts about the fraudulent scheme;

d.    Sent multiple emails to U.S.-based brokers facilitating the opening of brokerage accounts for co-conspirators, including false statements that co-conspirators were not affiliated persons of OST;

e.    Coordinated with Yan Zhao to ensure that co-conspirators received shares and could sell them through U.S. brokerage accounts; and

f.    Was charged in a four-count criminal indictment with orchestrating the pump-and-dump scheme.

134.    Lai Kui Sen's direct participation in every critical aspect of the fraudulent scheme—from signing the offering documents to facilitating brokerage accounts to making false statements to brokers—establishes beyond question that he acted with actual knowledge of the fraud and with intent to deceive investors.

135.    The fraudulent promotional campaign began on May 11, 2025—just weeks after the registered direct offering closed and the Select Investors received their first tranche of shares. This precise timing demonstrates premeditated coordination between the securities offerings and the market manipulation campaign, establishing that Defendants knew they were engaging in a fraudulent pump-and-dump scheme.

136.    The Warrant Exchange Agreement was executed on May 3, 2025, just 18 days after the registered direct offering, at a time when none of the Select Investors had exercised any warrants despite the stock price having increased from $0.80 to over $3.00. This demonstrates that the warrant exchange was pre-planned as part of the scheme, rather than being a legitimate economic transaction, and that Defendants knew the purpose was to provide co-conspirators with additional shares to dump at inflated prices.

137.    The sheer magnitude of the dilution and the absurd terms of the securities offerings establish that Defendants knew they were engaging in fraud:

a.      The Select Investors received 80 million shares (75% of the Company's outstanding shares) at an average cost of $0.0625 per share;

b.      Over 70 million of these shares were provided for zero cash consideration through the Warrant Exchange Agreement;

c.      The offerings diluted existing shareholders by nearly 300%;

d.      No legitimate business purpose justified providing 75% of the Company's shares to 15 investors at pennies per share;

e.      No vesting period or lock-up restrictions were imposed, allowing immediate selling; and

f.      The offering prices represented an 82-91% discount to market prices at various times during the scheme.

138.    During the period when OST's stock price increased 1,175%, the Company announced no significant business developments that would justify even a fraction of that increase. OST did not announce any significant business catalysts, new products, strategic partnerships, technological breakthroughs, or new customers.

139.    The complete absence of any legitimate reason for the stock price increase, combined with Defendants' knowledge of the fraudulent promotional campaign and the massive selling by insiders, establishes that Defendants knew the stock price was being artificially manipulated.

140.    Lai Kui Sen's false statements to brokers that co-conspirators were not "affiliated persons" of OST—when in fact they collectively owned 75% of the Company's shares—

demonstrates actual knowledge of the fraud. Lai Kui Sen knew that securities laws require disclosure of sales by affiliates and impose restrictions on such sales. By falsely representing that the co-conspirators were not affiliates, Lai Kui Sen deliberately attempted to facilitate their sales without triggering regulatory scrutiny.

141.    The fact that the U.S. Department of Justice, after a thorough investigation by the FBI and SEC Office of Inspector General, determined there was probable cause to charge Lai Kui Sen with criminal securities fraud and conspiracy is powerful evidence of his scienter. Federal prosecutors must present evidence to a grand jury, and a grand jury must find probable cause that a crime was committed. The grand jury's decision to indict Lai Kui Sen on four counts of securities fraud and related offenses strongly supports an inference of scienter.

142.    The fraudulent scheme alleged herein involved OST's core operations—specifically, the issuance and sale of the Company's own securities. The Individual Defendants, as officers and directors of OST, necessarily had detailed knowledge about the Company's securities offerings, share issuances, and capital-raising activities. The core operations doctrine establishes a strong inference that the Individual Defendants knew or recklessly disregarded the fraudulent nature of these transactions.

143.    Defendants had both motive and opportunity to commit the fraud alleged herein.

144.    Lai Kui Sen and the other Individual Defendants had motive to inflate OST's stock price through fraud because:

        a.    OST was financially distressed with declining revenues, mounting losses, and chronic compliance issues;

        b.    The Company faced potential delisting from NASDAQ for failing to maintain the minimum $1.00 bid price;

c.      Inflating the stock price through fraud would allow insiders and co-conspirators to sell shares at artificially high prices, generating tens of millions of dollars in proceeds;

d.      The scheme ultimately generated over $110 million in illicit proceeds for Lai Kui Sen and his co-conspirators.

145.    Defendants had opportunity to commit the fraud because:

a.      As officers and directors of OST, they controlled the Company's securities offerings and SEC filings;

b.      They had the authority to execute securities purchase agreements and warrant exchange agreements on behalf of OST;

c.      They had access to material non-public information about the Company's financial condition and operations;

d.      They controlled the timing and terms of securities offerings;

e.      They had relationships with U.S.-based brokers that they exploited to facilitate the scheme.

146.    The combination of motive and opportunity, together with the other facts alleged herein, establishes a strong inference of scienter.

**F.      <u>Loss Causation</u>**

147.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

148.    Throughout the Class Period, OST's stock price was artificially inflated as a result of Defendants' materially false and misleading statements and omissions and the fraudulent market manipulation scheme.

149.    The artificial inflation began on April 15, 2025, when Defendants closed the fraudulent registered direct offering and launched the coordinated promotional campaign. Prior to April 15, 2025, OST's stock traded at its 52-week low of $0.78-$0.80 per share, reflecting the Company's true value as a financially distressed manufacturer with declining operations.

150.    As a result of Defendants' fraud, OST's stock price increased to $9.40 per share on June 26, 2025—a 1,075% increase over the April 14, 2025 closing price of $0.80. This price increase was entirely artificial, driven by fraudulent manipulation rather than any legitimate business developments.

151.    On June 26, 2025, the scheme collapsed as co-conspirators completed their coordinated dump of fraudulently obtained shares. OST's stock price crashed from $9.40 to $0.55—a 94% decline—in a single day, wiping out over $950 million in market capitalization.

152.    The stock price collapse on June 26, 2025 was directly caused by and was a foreseeable result of Defendants' fraud. The co-conspirators' massive selling caused the crash, and that selling was the culmination of the fraudulent scheme Defendants had orchestrated.

153.    The public disclosure of the criminal indictment on September 12, 2025, further revealed the fraudulent nature of OST's securities offerings and the artificial manipulation of the stock price, causing NASDAQ to immediately halt trading.

154.    As a result of the revelations of fraud, the artificial inflation in OST's stock price was removed, causing Plaintiffs and Class members to suffer damages.

155.    The economic loss suffered by Plaintiffs and Class members—the difference between what they paid for OST securities during the Class Period and the true value of those securities absent Defendants' fraud—was directly and proximately caused by Defendants' fraudulent conduct. But for Defendants' fraud, Plaintiffs and Class members would not have

purchased OST securities at artificially inflated prices, or would not have purchased OST securities at all.

**G.      Reliance**

156.    At all relevant times, the market for OST's securities was efficient for the following reasons, among others:

157.    OST's Class A ordinary shares met the requirements for listing and were listed and actively traded on NASDAQ, a highly efficient and automated market.

158.    As a publicly traded company, OST filed periodic reports with the SEC and NASDAQ on Forms 20-F and 6-K.

159.    OST regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on national circuits of major newswire services such as GlobeNewswire, and through other wide-ranging public disclosures.

160.    OST's stock was actively traded on NASDAQ, with millions of shares trading hands each day during the Class Period. On June 26, 2025, alone, over 34.5 million shares traded.

161.    OST had a market capitalization in excess of $100 million during the Class Period (exceeding $1 billion at peak), making it a subject of significant investor attention.

162.    As a result of the foregoing, the market for OST's securities promptly digested current information regarding OST from all publicly available sources and reflected such information in the price of OST's stock. Under these circumstances, all purchasers of OST's securities during the Class Period suffered similar injury through their purchase of OST's securities at artificially inflated prices, and a presumption of reliance applies.

163.    Further, to the extent that Defendants made material misrepresentations or omissions in SEC filings or other statements to the market, a presumption of reliance also applies under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

### H.    No Safe Harbor

164.    The statutory safe harbor provided for forward-looking statements under the Private Securities Litigation Reform Act of 1995 (the "PSLRA") does not apply to any of the allegedly false statements pleaded in this Complaint.

165.    None of the statements complained of herein were forward-looking statements. Rather, they were statements of purportedly current facts and conditions, or failed to disclose current facts and conditions, regarding the nature and purpose of OST's securities offerings, the artificial manipulation of OST's stock price, and the fraudulent scheme being perpetrated by Defendants.

166.    To the extent that any statement alleged herein can be construed as forward-looking, that statement was not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the statement, as required by the PSLRA. The statements were also not immaterial or genuinely forward-looking, as they concerned matters of current fact that were knowingly false or misleading when made.

167.    To the extent that any statement alleged herein can be construed as forward-looking, at the time each such statement was made, the speaker knew that the statement was false or misleading, or the statement was authorized or approved by an executive officer of OST who knew that the statement was false or misleading when made. In particular, Lai Kui Sen, as co-CEO, had

actual knowledge of the fraudulent scheme and personally authorized and signed SEC filings containing materially false and misleading statements.

## CLASS ACTION ALLEGATIONS

168.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities who purchased or otherwise acquired OST Class A ordinary shares on the NASDAQ during the period from May 11, 2025, through and including June 26, 2025 (the "Class Period"), and who were damaged thereby (the "Class").

169.    Excluded from the Class are: (a) Defendants; (b) members of the immediate family of each Individual Defendant; (c) any subsidiary or affiliate of OST; (d) any entity in which any Defendant has or had a controlling interest; (e) the officers and directors of OST during the Class Period; (f) the legal representatives, heirs, successors, and assigns of any excluded person or entity; and (g) any person or entity who purchased OST securities as part of the fraudulent scheme alleged herein. Also excluded from the Class are any persons or entities who would otherwise be Class members but who validly and timely request exclusion from the Class.

170.    Numerosity: The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, OST's Class A ordinary shares were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs already are aware of more than 235 victims of and believe that there are thousands of members in the proposed Class. During the Class Period, OST had over 100 million shares outstanding (after the securities offerings), and millions of shares traded hands each day. On June 26, 2025, alone, over 34.5 million shares traded. The disposition of the claims of these Class members in a class action will provide substantial

benefits to the parties and the Court. Class members may be identified from records maintained by OST, its transfer agent, NASDAQ, and brokerage firms, and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

171.    Commonality and Predominance: Common questions of law and fact exist as to all Class members and predominate over any questions affecting solely individual Class members. Among the questions of law and fact common to the Class are:

    a.    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

    b.    Whether Defendants made false and/or misleading statements during the Class Period;

    c.    Whether Defendants omitted material facts necessary to make their statements not misleading during the Class Period;

    d.    Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

    e.    Whether the April 15, 2025 registered direct offering and May 3, 2025 Warrant Exchange Agreement were non-bona fide securities transactions designed to facilitate a pump-and-dump fraud;

    f.    Whether Defendants orchestrated a fraudulent promotional campaign to artificially inflate OST's stock price;

    g.    Whether Defendants engaged in a scheme to manipulate OST's stock price;

    h.    Whether Defendants facilitated the systematic dumping of fraudulently obtained shares by co-conspirators;

    i.    Whether the market for OST's securities was efficient;

j.      Whether Defendants' conduct caused the artificial inflation of OST's stock price during the Class Period;

k.      Whether the disclosure of the fraudulent scheme caused OST's stock price to decline;

l.      The extent to which members of the Class have sustained damages; and

m.      The proper measure of damages.

172.    Typicality: Plaintiffs' claims are typical of the claims of other Class members, as Plaintiffs and all Class members were similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein. Plaintiffs and all Class members purchased OST securities at artificially inflated prices during the Class Period and suffered damages when the artificial inflation was removed from the stock price.

173.    Adequacy: Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class action and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

174.    Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent or varying adjudications of the claims of individual Class members that could establish incompatible standards of conduct for Defendants, and will avoid the substantial risk of repetitious litigation. The damages or other financial detriment suffered by individual Class members may be relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, making it impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even for those Class members who

could afford individual litigation, it would be unduly burdensome to the judicial system. A class action is also superior because it will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class treatment will also permit the adjudication of relatively small claims by many Class members who could not otherwise afford to seek legal redress for the wrongs complained of herein. There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED THEREUNDER (Against All Defendants)

175.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

176.    This Count is asserted against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

177.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of OST securities; and (c) cause Plaintiffs and other members of the Class to purchase OST securities at artificially inflated prices.

178.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts and/or omitted to state material facts necessary to make the

statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of OST securities in an effort to maintain artificially high market prices for OST securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

179. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about OST's business, operations, and future prospects, as specified herein.

180. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of OST's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about OST and its business operations and future prospects in light of the circumstances under which they were made not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of OST securities during the Class Period.

181. The Defendants made the materially false and misleading statements and omissions set forth above either knowingly or with reckless disregard for the truth. The false and misleading statements and omissions complained of in this Complaint were materially false and misleading in that they failed to disclose and misrepresented the adverse facts pertaining to OST's business, operations, and prospects, which were known to or recklessly disregarded by Defendants, but concealed from the investing public, as detailed above.

182.    Each of the Individual Defendants, as a senior executive and/or director of OST, was aware of or recklessly disregarded facts that indicated that the public statements being made by or on behalf of OST were false and misleading. The Individual Defendants were closely involved in the day-to-day operations of OST and, at all relevant times, were directly involved in and closely monitored the decision-making process concerning OST's securities offerings, capital-raising activities, public disclosures, and reports to the SEC. The Individual Defendants participated in creating, reviewing, certifying, and/or signing OST's SEC filings and press releases. The Individual Defendants were provided with copies of OST's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

183.    In particular, Defendant Lai Kui Sen directly participated in the fraudulent scheme by signing the securities purchase agreement for the registered direct offering, signing the Warrant Exchange Agreement, signing SEC Forms 6-K containing materially false and misleading statements and omissions, and sending emails to brokers containing materially false statements to facilitate the opening of brokerage accounts for co-conspirators. Lai Kui Sen's direct participation in every critical aspect of the fraudulent scheme establishes that he acted with actual knowledge and intent to defraud.

184.    Defendant OST is liable for the materially false and misleading statements made and information released by its officers and directors, including the Individual Defendants named herein, through SEC filings, press releases, and other communications to investors and the market.

185.    Each Defendant, as alleged above, acted with scienter in that he, she, or it knew that the public documents and statements issued or disseminated in the name of OST were materially false and misleading, knew that such statements or documents would be issued or disseminated to

the investing public, and knowingly and substantially participated or acquiesced in the issuance or

dissemination of such statements or documents as primary violations of the securities laws. These

Defendants, by virtue of their receipt of information reflecting the true facts of OST, their control

over and/or receipt and/or modification of OST's allegedly materially misleading statements,

and/or their positions with the Company, which made them privy to confidential proprietary

information concerning OST, participated in the fraudulent scheme alleged herein.

186.    The Individual Defendants, as officers, directors, and/or controlling persons of a

publicly held company whose common stock was registered with the SEC pursuant to the

Exchange Act and traded on NASDAQ and governed by the provisions of the federal securities

laws, had a duty to promptly disseminate accurate and truthful information with respect to OST's

financial condition and operations, and to correct any previously issued statements that had

become materially misleading or untrue, so that the market price of OST's publicly traded

securities would be based upon truthful and accurate information.

187.    As a result of Defendants' false statements and omissions, OST securities traded at

artificially inflated prices during the Class Period. In ignorance of the fact that Defendants had

issued false and misleading statements and omitted material facts, and in reliance on Defendants'

statements and/or the integrity of the market in which OST securities traded, and/or on the absence

of corrective information in the market, Plaintiffs and the other members of the Class acquired

OST securities during the Class Period at artificially inflated prices and were damaged thereby.

188.    At the time of the misrepresentations and omissions alleged herein, Plaintiffs and

other members of the Class were ignorant of their falsity and believed them to be true. Had

Plaintiffs and the other members of the Class and the marketplace known of the true facts which

were not disclosed by Defendants or known of the falsity of the statements made by Defendants,

Plaintiffs and other members of the Class would not have purchased or otherwise acquired their OST securities, or, if they had acquired such securities, they would not have done so at the artificially inflated prices at which they acquired them.

189.    By reason of the conduct alleged herein, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

190.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of OST securities during the Class Period.

**COUNT II**

**VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT**
**(Against the Individual Defendants)**

191.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

192.    This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

193.    The Individual Defendants acted as controlling persons of OST within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions as officers and/or directors of OST, and their ownership of OST stock, the Individual Defendants had the power and authority to cause OST to engage in the wrongful conduct complained of herein. OST controlled the Individual Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

194.    As set forth above, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

195.    By virtue of their positions as officers and/or directors of OST during the Class Period, the Individual Defendants had the power and authority to cause OST to engage in the wrongful conduct complained of herein. OST controlled the Individual Defendants and all of its employees.

196.    As officers and/or directors of a publicly held company whose securities were and are registered with the SEC pursuant to the Exchange Act, whose securities trade on NASDAQ, and which was governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of OST's securities would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

197.    Each of the Individual Defendants was provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions of control and authority as senior officers and/or directors of OST, each of the Individual Defendants was able to and did, directly or indirectly, control the content of the public statements made by OST during the Class Period. Each Individual Defendant was provided with copies, in advance of their publication or dissemination, of OST's various press releases, SEC filings, and other communications alleged by Plaintiffs to be false and misleading, and had the ability, opportunity, and/or actual authority to prevent or cause the correction of such statements.

198.    In particular:

a.    Defendant Tao Ling, as Chairman and co-CEO, controlled OST's management and strategic direction and signed annual reports filed with the SEC;

b.    Defendant Lai Kui Sen, as co-CEO, directly participated in the fraudulent scheme by signing offering documents, SEC filings, and communications to brokers;

c.    Defendant Qiaoyun Xie, as CFO, was responsible for OST's financial reporting and signed annual reports and Sarbanes-Oxley certifications filed with the SEC;

d.    Defendants Xiaohong Yin, Heung Ming Wong, John Carl Mein, and Qiang He, as directors, participated in board decisions concerning the securities offerings and had the authority to prevent or correct false and misleading statements;

e.    Defendant Xiaodong Zhai, as CTO, was a senior executive with control over OST's operations; and

f.    Defendant Bo Yuan, as Secretary and Secretary of the Board, was directly involved in OST's securities offerings and corporate governance matters.

199.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the other members of the Class for damages suffered as a result thereof.

## COUNT III

## VIOLATION OF SECTION 1964(c) OF THE CIVIL RICO STATUTE
(Against All Defendants)

200.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

201.    This Count is asserted against all Defendants for violations of 18 U.S.C. § 1964(c), the civil enforcement provision of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

202.    Defendant OST is a legal entity organized under the laws of the Cayman Islands and is therefore a "person" and an "enterprise" within the meaning of 18 U.S.C. § 1961(3) and (4).

203.    Alternatively, Defendants and their co-conspirators (including the fifteen Select Investors and Yan Zhao) constituted an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4). The Enterprise was a group of individuals and entities associated together for the common purpose of executing the pump-and-dump scheme involving OST securities. The Enterprise had a common purpose, relationships among its members, and sufficient longevity to enable its members to pursue the Enterprise's purpose. The Enterprise functioned as a continuing unit with an ascertainable structure, including a hierarchy and division of responsibilities among its members.

204.    The Enterprise operated from at least December 2024 through at least August 2025, as alleged in the criminal indictment, and consisted of Defendants OST, Lai Kui Sen, the other Individual Defendants, Yan Zhao, and at least fifteen co-conspirators who received fraudulently distributed OST shares and systematically sold them at artificially inflated prices.

205.    The Enterprise had an organizational structure and hierarchy, with Lai Kui Sen and Yan Zhao serving as leaders who coordinated the fraudulent securities offerings, promotional campaign, brokerage account openings, and systematic selling. The other Individual Defendants, as officers and directors of OST, participated in or facilitated the scheme through their positions of authority within OST. The fifteen Select Investors served as recipients and sellers of the fraudulently distributed shares.

206.    The Enterprise engaged in and affected interstate commerce because it utilized the facilities of NASDAQ (located in New York), U.S.-based brokerage firms (located in New Jersey and New York), the SEC's EDGAR filing system (servers located in Virginia), interstate wire communications, the internet, and the U.S. mail to execute the fraudulent scheme.

207.    Defendants conducted and participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), which requires at least two predicate acts of racketeering activity.

208.    Defendants' pattern of racketeering activity consisted of multiple violations of 18 U.S.C. § 1343 (wire fraud), which is a predicate act under 18 U.S.C. § 1961(1)(B).

209.    Each of the following acts constitutes a separate predicate act of wire fraud in violation of 18 U.S.C. § 1343:

210.    April 15, 2025: Defendants caused the Prospectus Supplement for the registered direct offering to be filed with the SEC via EDGAR, which involved the transmission of electronic data in interstate commerce from OST to the SEC's servers in Alexandria, Virginia. The Prospectus Supplement contained material misrepresentations and omissions designed to deceive investors about the true nature and purpose of the offering, in furtherance of the fraudulent scheme to artificially inflate OST's stock price and enable co-conspirators to dump shares at inflated prices. This wire transmission was made with the intent to defraud investors.

211.    April 15, 2025: Defendants caused a press release announcing the registered direct offering to be disseminated to the investing public via interstate wire services (including GlobeNewswire). The press release contained material misrepresentations and omissions about the purpose of the offering and was transmitted in interstate commerce with the intent to defraud investors.

212.    April 16, 2025: Defendants caused Form 6-K announcing the registered direct offering to be filed with the SEC via EDGAR, which involved the transmission of electronic data in interstate commerce. The Form 6-K, signed by Lai Kui Sen, contained material misrepresentations and omissions designed to deceive investors about the fraudulent nature of the offering. This wire transmission was made with the intent to defraud investors.

213.    April 25, 2025: Defendant Lai Kui Sen sent an email via interstate wire transmission to a U.S.-based broker falsely representing that co-conspirators CC-1 and CC-2 had "participated in the registered direct offering" and that their shares were "non-restricted," in furtherance of the scheme to facilitate the opening of brokerage accounts for co-conspirators and enable them to dump fraudulently obtained shares. This email was sent with the intent to defraud investors by facilitating the sale of fraudulently obtained shares.

214.    May 12, 2025: Defendants caused Form 6-K disclosing the Warrant Exchange Agreement to be filed with the SEC via EDGAR, which involved the transmission of electronic data in interstate commerce from OST to the SEC's servers in Alexandria, Virginia. The Form 6-K, signed by Lai Kui Sen, contained material misrepresentations and omissions designed to deceive investors about the fraudulent nature of the warrant exchange and the scheme to provide co-conspirators with millions of shares for zero consideration. This wire transmission was made with the intent to defraud investors. This predicate act forms the basis of Count Three of the criminal indictment.

215.    May 12, 2025: Defendant Lai Kui Sen sent an email via interstate wire transmission to a U.S.-based broker stating: "Out [sic] company now outstanding share [sic] is 108,130,032," in furtherance of the scheme to facilitate co-conspirators' sales of fraudulently obtained shares. This email was sent with the intent to defraud investors.

216.    June 2, 2025: Defendant Lai Kui Sen sent an email via interstate wire transmission to a U.S.-based broker falsely representing that co-conspirators were not "affiliated persons" of OST, when in fact they collectively owned approximately 75% of OST's shares. This false statement was made in furtherance of the scheme to facilitate co-conspirators' sales of fraudulently obtained shares without triggering regulatory scrutiny. This email was sent with the intent to defraud investors.

217.    May 12, 2025: Defendants caused or facilitated numerous wire communications between co-conspirators, U.S.-based brokers, and brokerage firms for the purpose of opening brokerage accounts and transferring fraudulently obtained OST shares. These wire communications were made in interstate commerce and were essential to the execution of the fraudulent scheme. These wire communications were made with the intent to defraud investors.

218.    May-June 2025: Defendants caused or facilitated numerous wire communications in connection with the execution of trades selling fraudulently obtained OST shares at artificially inflated prices. Each trade execution involved wire communications between brokerage firms, NASDAQ, clearing firms, and other market participants in interstate commerce. These wire communications were made with the intent to defraud investors and obtain the proceeds of the fraudulent scheme.

219.    June 27, 2025: Defendants caused a press release to be issued stating that OST had "no undisclosed material matters" and was unaware of the reasons for the June 26, 2025 stock price crash. This statement was materially false and misleading because OST's co-CEO Lai Kui Sen had directly orchestrated the fraudulent pump-and-dump scheme that caused the crash. The press release was disseminated via interstate wire services with the intent to conceal the fraud and further deceive investors.

220.    The predicate acts alleged above constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) because they involve at least two acts of racketeering activity (in fact, multiple acts as detailed above), they are related to each other as part of a common scheme, they are not isolated events, and they pose a threat of continued criminal activity.

221.    The predicate acts are related because they all were committed in furtherance of the same fraudulent pump-and-dump scheme involving OST securities. The acts share the same purpose (to artificially inflate OST's stock price and enable co-conspirators to dump shares at inflated prices), the same participants (Defendants and their co-conspirators), the same victims (investors who purchased OST securities during the Class Period), and the same methods (fraudulent securities offerings, false SEC filings, fraudulent promotional campaigns, and systematic selling by insiders).

222.    The predicate acts demonstrate continuity because they occurred over a substantial period of time (at least from December 2024 through August 2025), involved open-ended conduct (the fraudulent scheme continued until it collapsed in June 2025 and trading was halted in September 2025), and would likely have continued but for the investigation and criminal charges by federal authorities.

223.    Moreover, as alleged in the research report, Defendants (particularly Yan Zhao) had previously engaged in similar fraudulent schemes involving at least two other Chinese companies (referred to as "Public Company A" and "Public Company B" in the criminal indictment), demonstrating a pattern of repeated fraudulent conduct over time targeting multiple companies and victims.

224.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiffs and Class members have been injured in their business or property.

225.    Specifically, Plaintiffs and Class members purchased OST securities at artificially inflated prices during the Class Period in reliance on the integrity of the market and/or Defendants' fraudulent statements and omissions. When the fraudulent scheme collapsed and the truth was revealed, OST's stock price crashed, causing Plaintiffs and Class members to suffer substantial losses.

226.    Plaintiffs and Class members' injuries were directly and proximately caused by Defendants' RICO violations. But for Defendants' fraudulent scheme, Plaintiffs and Class members would not have purchased OST securities at artificially inflated prices or would not have purchased OST securities at all.

227.    Defendants' RICO violations were a substantial factor in causing Plaintiffs and Class members' injuries. The fraudulent securities offerings, false SEC filings, promotional campaign, and systematic insider selling—all accomplished through wire fraud—directly caused the artificial inflation of OST's stock price and Plaintiffs and Class members' losses when the scheme collapsed.

228.    Pursuant to 18 U.S.C. § 1964(c), any person injured in his business or property by reason of a violation of 18 U.S.C. § 1962 may sue therefor and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

229.    Plaintiffs and Class members are entitled to recover treble damages, costs, and reasonable attorneys' fees as provided by 18 U.S.C. § 1964(c).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.      Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel for the Class;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding treble damages pursuant to 18 U.S.C. § 1964(c) in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' RICO violations;

D.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

E.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court; and

F.      Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: February 16, 2026                     */s/ Andrew W. Robertson*

**MORRIS KANDINOV LLP**
Aaron T. Morris
Andrew W. Robertson
William H. Spruance III
305 Broadway, 7th Floor
New York, NY 10007
(212) 431-7473
aaron@moka.law
andrew@moka.law
william@moka.law

**MORRIS KANDINOV LLP**
Leonid Kandinov
550 West B Street, 4th Floor
San Diego, CA 92101
(619) 780-3993
leo@moka.law

**HIGHFUL LAW PLLC**
Tyler Highful
5900 Balcones Drive, Suite 100
Austin, TX 78731
(512) 666-7426
tyler@highful.com

*Attorneys for Plaintiffs*