**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FLAVIO ALAZRAKI, PAOLO BARBESINO, OKAN BÖKE, MAURIE DAIGNEAU, CLAUDE RITZMANN, MICHAEL SOLAN, MAHLEGHA ARDEHALI, AND SALIH ZEKI OZDEM,

Plaintiffs,

v.

OSTIN TECHNOLOGY GROUP CO., LTD., TAO LING, LAI KUI SEN, QIAOYUN XIE, XIAOHONG YIN, XIAODONG ZHAI, BO YUAN, HEUNG MING WONG, JOHN CARL MEIN, AND QIANG HE,

Defendants.

Case No. 1:26-cv-1288-DEH

**AMENDED CLASS ACTION COMPLAINT**

**Jury Trial Demanded**

Lead Plaintiffs Flavio Alazraki, Claude Ritzmann, Paolo Barbesino, Michael Solan, Maurie Daigneau, and Okan Böke, and additional named Plaintiffs Salih Zeki Ozdem and Mahlegha Ardehali (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ostin Technology Group Co., Ltd. ("Ostin" or the "Company"), analysts' reports and advisories about the Company, the criminal indictment unsealed by the U.S. Department of Justice ("DOJ") on September 12, 2025, charging certain defendants with securities fraud, wire fraud, and conspiracy, discussion with and data collected from a group of more than 235 victims of the fraudulent scheme, and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Ostin securities between April 15, 2025 and June 26, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Ostin was incorporated in the Cayman Islands on or about September 26, 2019, with principal executive offices in Nanjing, China. The Company claimed to be a manufacturer of display modules used in consumer electronics, commercial liquid-crystal ("LCD") displays, and automotive displays. Shares of Ostin were publicly traded on the Nasdaq Stock Market (the "Nasdaq"), a national securities exchange, under the symbol "OST." Ostin was an issuer subject to Section 12 of the Securities Exchange Act of 1934 (the "Exchange Act") and was required to file reports under Section 13 of the Exchange Act.

3. According to a criminal grand jury indictment that the U.S. Department of Justice ("DOJ") unsealed in the case of the *United States v. Yan Zhao and Lai Kui Sen*, Case No.: 1:25-CR-259 ("Indictment")[1], from at least in or around December 2024, and continuing through in or around August 2025, Yan Zhao (operating under aliases including "Hank Shi," "Hank Shu," "Altman," and "Bob"), Lai Kui Sen, and their co-conspirators (e.g., co-conspirator 1 or "CC-1", co-conspirator 2 or "CC-2", co-conspirator 3 or "CC-3," and co-conspirator 4 or "CC-4,") engaged in a multifaceted securities pump-and-dump scheme involving Ostin, which resulted in investor losses of over $110 million.

4. Beginning on or about April 15, 2025, Defendants and their co-conspirators engineered a fraudulent sequence of securities offerings to place the majority of Ostin shares in the hands of fifteen co-conspirators for heavily discounted or no remuneration. These securities offerings were synchronized with a fraudulent campaign to artificially inflate the price and trading volume of Ostin stock through social media and messaging service applications, including promotions that impersonated actual investment advisors and financial professionals. The scheme

[1] Attached hereto as Exhibit A.

employed sophisticated tactics including AI-generated deepfake[2] videos, coordinated WhatsApp groups, false acquisition rumors, and guaranteed return promises to lure unsuspecting retail investors. As a result of the fraudulent social media campaign, Ostin's stock price increased 1,075% from a closing price of $0.80 on April 14, 2025, to a peak price of $9.40 on June 26, 2025.

5. In a period of roughly two months, the fraudulent promotional campaign artificially inflated the value of Ostin from an approximately $22 million company into a greater than $1 billion company by market capitalization. As Ostin's stock price rose, Defendants facilitated the opening of brokerage accounts on behalf of co-conspirators, which were used to unload the millions of Ostin shares that were obtained through non-bona fide securities offerings, sham transactions where a company artificially creates the illusion that a stock sale has successfully met its financial goals without legitimate public investment, generating substantial profits for Defendants and their co-conspirators.

6. On June 26, 2025, the day Ostin's stock price hit its peak price, Defendants and their co-conspirators engaged in a massive selloff of their fraudulently obtained securities, which, after weeks of coordinated selling, resulted in the members of the conspiracy obtaining more than $110 million in illicit proceeds from the sale of Ostin stock. Ostin investors suffered significant losses, and Ostin lost over $950 million in market capitalization, representing over 94% of its value, in a single day.

---

[2] A deepfake is a form of artificial intelligence ("AI") that creates hyper-realistic, manipulated video, audio, or images of real people. Using vast amounts of data—such as photos, video clips, and voice recordings—AI models can synthesize these likenesses to convincingly depict individuals saying or doing things they never actually did. In pump and dump schemes, like the one alleged herein, the perpetrators exploit this technology by using deepfake videos of well-known financial experts, celebrities, or CEOs to promote fraudulent, low-cost stocks or cryptocurrencies.

7. Post-Class Period, on September 12, 2025, the DOJ unsealed the criminal Indictment in the Eastern District of Virginia charging Defendants Lai Kui Sen, Ostin's co-Chief Executive Officer, and Yan Zhao, a financial advisor, with conspiracy to commit securities fraud and wire fraud, securities fraud under Title 18, wire fraud, and securities fraud under Title 15. The Indictment alleges that the defendants, along with at least fifteen co-conspirators, orchestrated the pump-and-dump scheme.

## JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). A substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred in this District, including brokerage firms located in New York through which Defendants and their co-conspirators facilitated the opening of accounts and the sale of Ostin shares obtained through the non-bona fide securities offerings described herein.

11. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

12. Plaintiffs acquired Ostin securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

13. Defendant Ostin was founded in 2010 and went public through an initial public offering in 2022. Ostin is incorporated in the Cayman Islands with principal executive offices in Nanjing, China. Ostin operates through a variable interest entity ("VIE"), with a British Virgin Islands holding entity (Ostin Technology Holdings Limited) owning a Hong Kong subsidiary (Ostin Technology Limited), which in turn holds contracts with Chinese operating entities in Nanjing, primarily Jiangsu Austin Optronics Technology Co., Ltd. ("Jiangsu Austin"). Ostin's stock trades in an efficient market on Nasdaq under the ticker symbol "OST."

14. Defendant Tao Ling is the Chairman of the Board of Directors (the "Board") and the Chief Executive Officer ("CEO"). Ling has served as a Director since inception, has served as Ostin's Chairman and Chief Executive Officer since June 2020, and, together with Defendant Sen, as Co-Chief Executive Officer of Ostin from January 21, 2025 through October 21, 2025 when Sen was removed from his position as Co-Chief Executive Officer and a Director following Sen's criminal Indictment. Ling has also served as Chairman of Jiangsu Austin since December 2010. During the Class Period, Ling possessed the power and authority to control the contents of Ostin's SEC filings, press releases, and other public statements. Ling signed Ostin's annual reports on Form 20-F filed with the SEC. As a senior executive and Chairman of the Board, Ling was involved in managing Ostin's business and operations and was privy to confidential information concerning, among other things, Ostin's financial condition, operations, business, and future prospects. Because of his position with the Company, Ling had access to material non-public

information about Ostin's business, finances, operations, and future prospects, including the fraudulent nature of the securities offerings and the artificial manipulation of Ostin's stock price.

15. Defendant Lai Kui Sen has served as Ostin's co-CEO and as a Director since January 2025, serving as Co-Chief Executive Officer, together with Defendant Ling, from January 21, 2025 through October 21, 2025, when Sen was removed as co-CEO and Director following his criminal Indictment. As co-CEO, Sen possessed authority over Ostin's business operations and strategic direction. Sen signed the securities purchase agreement for the April 15, 2025 registered direct offering ("RDO") on behalf of Ostin. Sen signed the Warrant Exchange Agreement on behalf of Ostin. Sen signed SEC Forms 6-K filed on April 16, 2025, and May 12, 2025, which disclosed the fraudulent securities offerings. Sen sent multiple emails to U.S.-based brokers facilitating the opening of brokerage accounts for co-conspirators and falsely representing that co-conspirators were not affiliated persons of Ostin. On September 10, 2025, the DOJ charged Sen in a criminal Indictment with conspiracy to commit securities fraud and wire fraud, securities fraud, wire fraud, and fraud in connection with the purchase and sale of securities, alleging that he orchestrated the pump-and-dump scheme involving Ostin stock. Because of his position with the Company and his direct involvement in the fraudulent scheme, Sen had access to material non-public information about Ostin's business, finances, operations, and future prospects, including the fraudulent nature of the securities offerings and the artificial manipulation of Ostin's stock price.

16. Defendant Qiaoyun Xie has served as Ostin's Chief Financial Officer ("CFO") since June 2020 and the finance manager of Jiangsu Austin since March 2020. She is primarily in charge of financial reporting and auditing of Jiangsu Austin. Xie signed Ostin's annual reports on Form 20-F filed with the SEC, including certifications pursuant to the Sarbanes-Oxley Act of 2002 attesting to the accuracy of Ostin's financial statements. Because of her position as CFO, Xie had

access to material non-public information about Ostin's business, finances, operations, and future prospects, including information regarding the Company's securities offerings, share issuances, and dilution. Xie knew or recklessly disregarded that the RDO and Warrant Exchange Agreement were non-bona fide transactions designed to facilitate the fraudulent pump-and-dump scheme.

17. Defendant Xiaohong Yin has served as a Director since June 2020. Yin has also served as Director and General Manager of Jiangsu Austin since January 2011 and oversees production, quality control, and after-sale services as well as sales activities of the LCM/OC Department of Jiangsu Austin. As a Director of Ostin during the Class Period, Yin had the power and authority to control the Company's business and operations. Yin participated in or was privy to discussions and decisions concerning Ostin's business, operations, financial condition, and future prospects, including the securities offerings that formed the basis of the fraudulent scheme. Because of his positions as Director of Ostin and General Manager of Jiangsu Austin, Yin had access to material non-public information about Ostin's business, finances, operations, and future prospects.

18. Defendant Xiaodong Zhai has served as the Chief Technology Officer since June 2021. Zhai has served as the Research and Development Director of Jiangsu Austin since May 2015 and is in charge of research and development and production of Jiangsu Austin. During the Class Period, Zhai possessed the authority to control or influence Ostin's business operations and was privy to confidential information concerning the Company's business and operations. Because of his position as a senior executive officer, Zhai had access to material non-public information about Ostin's business, finances, operations, and future prospects.

19. Defendant Bo Yuan has served as the Company's Secretary since June 2021. Yuan has served as Secretary of the Board of Directors and Deputy General Manager of Jiangsu Austin

since April 2015 and oversees Jiangsu Austin's strategic decision, investment, financing and securities affairs. As Secretary of Ostin and Jiangsu Austin, Yuan was directly involved in the Company's securities offerings and corporate governance matters during the Class Period. Yuan knew or should have known about the material terms and circumstances surrounding the RDO and Warrant Exchange Agreement. Because of his role at Ostin, Yuan had access to material non-public information about Ostin's business, finances, operations, and future prospects, including information regarding the securities offerings.

20. Defendant Heung Ming Wong is a non-management Director on the Audit Committee, Nominating and Corporate Governance Committee, and the Chair of the Compensation Committee. Wong has over twenty years of experience in advising multinational companies of finance, accounting, internal control and corporate governance matters and has served as a Director of TD Holdings, Inc., a company engaged in commodity trading and supply chain services businesses, since April 2021. As a Director, Wong owed fiduciary duties to Ostin shareholders and had the power and authority to control the Company's business and operations. Wong participated in or was privy to discussions and decisions concerning Ostin's business, operations, financial condition, and future prospects, including the securities offerings that formed the basis of the fraudulent scheme. Through his role as a Director, Wong had access to material non-public information about Ostin's business, finances, operations, and future prospects.

21. Defendant John Carl Mein is a non- management Director on the Company's Audit Committee, Compensation Committee, and the Chair of the Nominating and Corporate Governance Committee. Mein has operated Mein Executive Talent, an independent recruiting and business development firm, since August 2019, where he serves as the President and the sole employee, and he is responsible for business development and recruiting talents for various

established and startup companies including DustPhotonics, Inc. Mobile & Cloud Labs, Inc., Achronix, Inc., and Hyperlight Corporation. As a Director, Mein owed fiduciary duties to Ostin shareholders and had the power and authority to control the Company's business and operations. Mein participated in or was privy to discussions and decisions concerning Ostin's business, operations, financial condition, and future prospects, including the securities offerings that formed the basis of the fraudulent scheme. Through his role as a Director, Mein had access to material non-public information about Ostin's business, finances, operations, and future prospects.

22. Defendant Qiang He is a non-management Director on the Company's Nominating and Corporate Governance Committee, Compensation Committee, and the Chair of the Audit Committee. Qiang He served as a Director for Viomi Technology Co., Ltd., a leading provider of smart home products and services in China, from May to August 2020, where he oversaw financial reporting and disclosure. As a Director, Qiang He owed fiduciary duties to Ostin shareholders and had the power and authority to control the Company's business and operations. Qiang He participated in or was privy to discussions and decisions concerning Ostin's business, operations, financial condition, and future prospects, including the securities offerings that formed the basis of the fraudulent scheme. Through his role as a Director, Qiang He had access to material non-public information about Ostin's business, finances, operations, and future prospects.

23. Defendants Tao Ling, Lai Kui Sen, Qiaoyun Xie, Xiaohong Yin, Xiaodong Zhai, Bo Yuan, Heung Ming Wong, John Carl Mein, and Qiang He are collectively referred to herein as the "Individual Defendants."

24. The Individual Defendants possessed the power and authority to control the contents of Ostin's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Ostin's SEC filings and press releases alleged herein to

be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Ostin, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

25. Ostin and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

26. Ostin was incorporated in the Cayman Islands on or about September 26, 2019, with principal executive offices in Nanjing, China. The Company claimed to be a manufacturer of display modules used in consumer electronics, commercial LCD displays, and automotive displays. Ostin was an issuer subject to Section 12 of the Securities Exchange Act of 1934 (the "Exchange Act") and was required to file reports under Section 13 of the Exchange Act.

27. Ostin operated using a VIE investment structure, which was often used by Chinese companies listed on U.S. exchanges. Rather than purchasing and owning shares of the underlying foreign operating company—which for Ostin was based in China—VIE investors purchased shares in a holding company which in turn controlled or owned the underlying foreign operating company. These holding companies were usually incorporated in the Cayman Islands.

28. Defendant Lai Kui Sen became Ostin's co-CEO in January 2025.

29. Yan Zhao held himself out as a financial advisor and utilized various aliases, including "Hank Shi, Hank Shu," "Altman," and "Bob."

30. Before the events giving rise to this action, Zhao had participated in substantially similar trading activity involving other Nasdaq-listed, China-based issuers that utilized VIE structures, including Public Company A (purported to be China Liberal Education Holdings Ltd. ("CLEU")), Public Company B (purported to be Jayud Global Logistics Ltd. ("JYD")), and later Public Company C (purported to be Pheton Holdings ("PTHL")). Like Ostin, each company was incorporated in the Cayman Islands, maintained principal executive offices in China, and traded on Nasdaq.

31. From December 2024 to at least January 2025, Zhao met with various brokers. Zhao then directed sales of his clients' CLEU and JYD stock to the brokers, including at or around the time that CLEU and JYD's stock prices were crashing.

32. Specifically, in or around January 2025, Zhao attempted to open accounts and transfer the shares of two clients who had participated in a securities offering for CLEU.

33. The CLEU pump-and-dump scheme resulted in a DOJ criminal indictment that charged seven individuals with securities and wire fraud under Title 18.

34. As of the close of trading on December 23, 2024, CLEU's share price traded at approximately $0.162, which was below the Nasdaq minimum bid price of $1. On or about December 24, 2024, CLEU executed a share consolidation that consolidated every 15 ordinary shares of its stock into one ordinary share, resulting in a total amount of approximately 29 million outstanding shares of stock. Afterwards, the value of CLEU's stock increased above $1 per share. This share consolidation was publicly announced on January 13, 2025.

35. To enact the scheme, CLEU defendants engaged in misleading promotion and coordinated trading of CLEU stock that caused the price of CLEU's stock to artificially rise and then ultimately to decrease significantly, at the expense of other investors who had been purchasing the stock. In fact, the assistant attorney general of the DOJ's Criminal Division said that "this was a coordinated act of both social and market manipulation."

36. In furtherance of the scheme, in January 2025, investors based in the United States were contacted through electronic messaging services by individuals purporting to be investment advisors in the United States, including Chicago, Illinois, when in fact, these individuals were not actually U.S.-based investment advisors and were based in China.

37. On or about January 27, 2025, CLEU publicly disclosed for the first time in a filing with the SEC that it had issued approximately 240 million shares on December 31, 2024, and that as of January 27, 2025, there were approximately 269 million shares of CLEU stock outstanding, whereas the company previously had acknowledged only approximately 29 million shares outstanding. At that time, the value of CLEU stock was trading at approximately $7.30 per share, but by the end of the trading day on January 30, 2025, CLEU's stock price had dropped to approximately $0.14 per share, a decrease of approximately 99%.

38. CLEU has since been delisted from Nasdaq.

39. In addition to Ostin, Audit Alliance also serves as CLEU's auditor.

40. The JYD scheme was an alleged pump-and-dump scheme that left investors with catastrophic losses after the stock price was artificially inflated through social media misinformation and coordinated selling by insiders and affiliates.

41. In or around March 2025, Zhao introduced a broker to a client who owned JYD shares. The broker opened an account in the name of Zhao's client and initiated a transfer of the JYD shares into the account.

42. In early April 2025, mere weeks later, JYD's stock price surged dramatically from approximately $1.00 per share to a peak near $8.00 per share. This surge occurred due to promotion without any corresponding fundamental news. The price surge abruptly ended when the stock suffered a sudden, catastrophic collapse of approximately 95% from its recent high.

43. Additionally, in Zhao's JYD pump-and-dump scheme, proposed private investment in public equity ("PIPE") investors of JYD ordinary shares were actually related parties to JYD and its subsidiary. In other words, JYD was dealing ordinary shares to itself without disclosing that information to the public and SEC.

44. As alleged below, Ostin exhibited many of the same characteristics as these prior issuers—including a Cayman Islands holding-company structure, operations centered in China, financial distress, share consolidations, and suspicious capital-raising activity—before Defendants undertook the transactions that form the basis of the fraudulent scheme alleged herein.

**<u>Financial Struggles of Ostin</u>**

**A. <u>Finances and Stock</u>**

45. Ostin was financially distressed, had declining revenues and mounting losses, and faced persistent challenges raising capital and maintaining its Nasdaq listing. As alleged herein, those conditions made the Company particularly susceptible to the fraudulent scheme that ensued.

46. According to the Company's 20-F annual report filed January 27, 2025 (the "2024 20-F"), the Company had negative working capital of $20,117,076, net loss of $10,189,391, accumulated deficit of $18,527,479, and negative operating cash flow of $4,942,568. According

to the Company's 20-F annual report filed January 31, 2024 (the "2023 20-F"), the Company had negative working capital, net loss of $11,013,966, accumulated deficit of $8,465,867, and negative operating cash flow of $2,591,320.

47. In fact, the Company stated in its 2024 20-F that the condition "raise[d] substantial doubt about the Company's ability to continue as a going concern."

48. The Company had institutional ownership of merely 0.1%. Such minimal institutional ownership reflected the absence of meaningful participation by sophisticated market participants and left Ostin's stock particularly susceptible to price manipulation through coordinated retail promotion because relatively little legitimate institutional trading existed to counteract artificial demand.

49. Ostin also exhibited significant, and increasing, customer and supplier concentration risk. For the fiscal year ended September 30, 2025, two customers accounted for approximately 45.2% and 10% of Ostin's total revenue, respectively, up from 35.3% and 11.3% for the fiscal year ended September 30, 2024. Similarly, two suppliers accounted for approximately 36.8% and 6.3% of Ostin's total purchases of raw materials for the fiscal year ended September 30, 2025, compared to 43.2% and 10.9% for the fiscal year ended September 30, 2024.

50. Ostin also faced persistent Nasdaq listing compliance issues. On January 24, 2024, Ostin announced that it received a written notification from Nasdaq indicating that for the last 30 consecutive business days, the closing bid price for the Company's ordinary shares was below the minimum bid price of $1.00 per share. The Company was provided with a compliance period of 180 calendar days, or until July 17, 2024, to regain compliance or else it could be delisted.

51. In July 2024, the Company announced that it had received an extension for an additional 180 calendar days, or until January 13, 2025, to regain compliance. On December 19,

2024, the Company announced that it resolved to effect a reverse share split of the Company's ordinary shares, with the split ratio set at 1-for-10, in order to regain compliance with Nasdaq. The reverse share split was approved by the Company's shareholders at an extraordinary general meeting held on November 25, 2024, and became effective on December 31, 2024, under a new CUSIP number, G67927114.

52. By late 2024, Ostin had withdrawn from standard SEC quarterly reporting obligations and instead filed only annual reports on Form 20-F. As a result, investors received materially less frequent information concerning Ostin's financial condition and operations, reducing transparency at the very time Defendants were preparing the transactions that form the basis of the fraudulent scheme alleged herein.

**B. Offerings to Third Parties**

53. As Ostin's financial condition deteriorated, Defendants increasingly relied on outside financing transactions to raise capital. Those transactions illustrate both the Company's growing need for liquidity and Defendants' willingness to utilize highly dilutive financing arrangements.

54. On January 19, 2024, Ostin entered into a securities purchase agreement with Streeterville Capital, LLC ("Streeterville"), a venture capital and private equity investment firm led by President John Fife ("Fife") and founded in 2020, with operations in Utah and Tennessee. The securities purchase agreement related to the issuance and sale of a senior unsecured convertible note in the principal amount of $550,000, at a purchase price of $500,000. The note was convertible into ordinary shares of the Company, par value $0.0001 per share.

55. The note bore simple interest at 7% per annum, matured on January 22, 2025, and carried an original issue discount of $40,000 plus $10,000 for the Buyer's transaction costs, so the

Company received $500,000 for a $550,000 note. Beginning six months after issuance, Streeterville had the right to convert the note into ordinary shares at a price equal to 80% of the lowest daily volume weighted average price of Ostin's ordinary shares over the ten consecutive trading days preceding the conversion date, subject to a floor of $0.1436 per share, and the note provided for default interest of up to 22% per annum and increases in the outstanding balance of up to 25% upon defined trigger events. Because the conversion price floated at a discount to the lowest recent trading price, the note entitled Streeterville to an increasing number of newly issued shares as Ostin's share price declined. Ostin did not, however, issue any shares upon conversion of this note; the Company repaid the January 2024 note in full on June 24, 2024, and the note was canceled.

56. On June 21, 2024, the Company entered into a securities purchase agreement with Streeterville relating to the issuance and sale of a senior unsecured convertible note in the principal amount of $1,360,000, at a purchase price of $1,250,000. The note was convertible into Class A ordinary shares of the Company, par value $0.0001 per share.

57. This note likewise bore simple interest at 7% per annum, matured on June 24, 2025, and carried an original issue discount of $100,000 plus $10,000 for the Buyer's transaction costs, so the Company received $1,250,000 for a $1,360,000 note. It was convertible at 80% of the lowest daily volume weighted average price of Ostin's Class A ordinary shares over the ten consecutive trading days preceding conversion, subject to an even lower floor of $0.086 per share, up to a maximum monthly redemption amount of $500,000, and it carried the same default-interest and trigger-event balance-increase provisions as the January 2024 note. The Class A ordinary shares issuable on conversion were registered for resale by a prospectus supplement, filed June 21, 2024, to the same shelf registration statement on Form F-3 (File No. 333-279177) that Ostin later used

for the April 15, 2025 RDO that commenced the Class Period. Streeterville converted the June 2024 note into Ostin ordinary shares in June, August, and September 2024 at pre-split conversion prices of $0.3212, $0.2181, and $0.2371 per share, and Ostin issued Streeterville 912,098 ordinary shares upon those conversions through September 30, 2024.

58. Based on the Company's SEC filings, Streeterville converted the notes into 10.5 million ordinary shares, accounting for 9.8% of the 107.43 million shares outstanding as of May 12, 2025. Per the Company's August 14, 2025, SEC filing, Streeterville liquidated all shares and owned 0 shares of Ostin, thereby dumping its holdings within a span of three months.

59. Streeterville had a history of involvement in fraud. According to a *Financial Times* article, Fife had a now-settled fraud case involving "dozens of phony family trusts" and "even more devious schemes" that occurred in 2007. In 2020, the SEC described Fife as a "recidivist violator of the federal securities laws". The SEC alleged that Fife and his companies made more than $60 million in profits between 2015 and 2019 from a "very lucrative" model: buying "convertible promissory notes" that converted into newly issued shares, which they would "rapidly sell . . . into the public market at a profit."

60. Streeterville's dealings with Ostin followed a business model the firm has employed with numerous other public companies. In its dealings with Allarity Therapeutics, Inc., for example, Streeterville negotiated a contractual cap limiting its beneficial ownership of the issuer's stock to 9.99% at any given time, a structure that permits Streeterville to continuously convert its notes into newly issued shares and sell those shares into the market. Streeterville has also held a secured convertible note in Faraday Future Intelligent Electric Inc. and has reported beneficial ownership positions in Canaan Inc. and MGT Capital Investments, Inc., among other public companies.

61. Streeterville's publicly reported regulatory history and financing practices were matters of public record. Nevertheless, Defendants entered into multiple securities purchase agreements with Streeterville.

62. In addition to Ostin's association with disreputable investment firms, Ostin also repeatedly employed auditors with shoddy audit practices.

63. Up until September 23, 2024, TPS Thayer, LLC ("TPS Thayer") was Ostin's independent registered public accounting firm.

64. On December 4, 2025, The Public Company Accounting Oversight Board (the "PCAOB"), a nonprofit corporation established by Congress to oversee the audits of public companies, announced that it sanctioned TPS Thayer for failing to appropriately plan five audits of two public companies—one of which was Ostin and the other of which was Huadi International Group Co., Ltd.—and for failing to reasonably supervise an unregistered public accounting firm – also based in China – that played a substantial role in those audits. PCAOB censured TPS Thayer, imposed a civil money penalty in the amount of $100,000, and required TPS Thayer to undertake certain contingent remedial actions.

65. On September 23, 2024, Ostin appointed Audit Alliance LLP ("Audit Alliance") as its independent registered public accounting firm.

66. Notably, Audit Alliance was the subject of a PCAOB inspection report dated September 27, 2024. The report covered three audits from fiscal year 2022 and found deficiencies in 2 of the 3 audits reviewed. Specifically, the PCAOB found that in one audit the firm identified a fraud risk in revenue recognition but failed to adequately test it, and that in two of the three audits the firm failed to communicate to the Audit Committee, and to accurately report on Form AP, the participation of another accounting firm, in violation of AS 1301 and PCAOB Rule 3211.

**The PIPE Agreement**

67. Against the backdrop of Ostin's financial distress, questionable financing efforts, and corporate governance concerns, Defendants entered into the February 2025 PIPE transaction described below.

68. On February 10, 2025, the Company entered into a securities purchase agreement with certain individuals (the "PIPE Purchasers"), pursuant to an exemption from the registration requirements of Section 4(a)(2) of the Securities Act and Regulation S promulgated thereunder. The securities purchase agreement concerned the sale of 965,513 class A ordinary shares through a PIPE at a purchase price of $1.45 per share. The PIPE Purchasers also received warrants to purchase 2,896,539 class A ordinary shares, equal to 300% of the class A ordinary shares purchased. A warrant is a financial instrument that gives the holder the right, but not the obligation, to purchase a company's stock at a specific price within a certain timeframe. Defendant Sen signed the securities purchase agreement on behalf of Ostin as Co-Chief Executive Officer.

69. The PIPE Purchasers exercised the warrants through an alternate cashless exercise and received an aggregate of 24,582,913 class A ordinary shares. The class A ordinary shares issued in the PIPE, and upon exercise of the warrants, were subject to lock-up agreements for twenty months following the closing date of the PIPE, where the PIPE Purchasers could not offer or sell any class A ordinary shares beneficially owned, held or thereafter acquired.

70. Additionally, certain affiliated shareholders of the Company, including SHYD Investment Management Limited and JQZY Investment Management (the "Affiliates"), entered into an affiliate lock-up agreement, pursuant to which, the Affiliates agreed not to offer or sell any class A ordinary shares for twenty months following the closing date of the PIPE. On information and belief, SHYD Investment Management Limited is controlled by Defendant Ling, and JQZY

Investment Management Limited is controlled by Defendant Yin. The Affiliates only had close to 300,000 class A ordinary shares after the PIPE deal (190,900 from SHYD Investment Management Limited and 96,200 from JQZY Investment Management Limited).

71. SHYD Investment Management Limited's affiliation with Ostin predates the PIPE. On March 28, 2024, pursuant to a resolution of the Company's shareholders, Ostin issued 2 million Class B ordinary shares to SHYD Investment Management Limited at an issuance price of $0.0001 per share.

72. As consideration for the PIPE, the PIPE Purchasers have surrendered and forever relinquished their claim to a $1.2 million loan originally made to the Company in December 2024 by Dasheng Consulting Services Limited, a Hong Kong entity, together with $200,000 in additional cash consideration. On information and belief, Dasheng's claim to the loan was assigned to the PIPE Purchasers pursuant to a Loan Assignment and Assumption Agreement dated February 10, 2025. On information and belief, Dasheng Consulting Services Limited's sole director and shareholder is an individual identified in Hong Kong corporate records as "Then Ee Lin," who lists an address in Sarawak, Malaysia that appears to be a residential property, but whose registered email address for Dasheng uses a Chinese ("163.com") domain commonly associated with mainland China rather than Malaysia—circumstances suggesting Dasheng was not a genuine, independent counterparty to the loan.

73. Tellingly, Defendants still entered into other purchase agreements that would dilute shares and actually received votes from the PIPE Purchasers to issue those shares, even though the PIPE Purchasers would lose control and their shares would be diluted. Specifically, the securities purchase agreement filed by Ostin on April 16, 2025, stated that "the Company has obtained the written consent by a majority of purchasers of the PIPE SPA where the consenting purchases have

more than 51% of the initial subscription amounts of the PIPE SPA in connection with the entry of this Agreement and the transaction contemplated hereto."

74. The PIPE securities purchase agreement included an express short-selling carveout (Sections 3.2(j) and 4.13) permitting the PIPE Purchasers to borrow Ostin shares for the purpose of effecting short sales or similar transactions after the transaction was publicly announced.

75. A legitimate accredited-investor private placement does not contain a carveout authorizing the buyer to short-sell the issuer's stock following announcement; standard PIPE documentation in the private-placement market universally restricts the buyer from short-selling, because a buyer who can short-sell can lock in profits from any post-placement price decline.

76. By executing the PIPE securities purchase agreement's short-selling carveout, there is an inference that Defendants Sen and Ling knew the PIPE Purchasers were trading-oriented actors intending to profit from market activity in Ostin's stock, not passive accredited investors purchasing for investment. A carveout allowing trading against the issuer's stock shows that the placement terms exposed public investors to adverse trading by low-cost share recipients and supports the inference that Ostin was not raising capital from arm's-length investors but was concentrating cheap shares with connected counterparties before the promotional run-up.

77. This mirrors Zhao's PIPE in JYD, where investors were related parties to JYD and its subsidiary, as JYD was dealing ordinary shares to itself without disclosing that information to the public and SEC. As with the JYD PIPE, the Ostin PIPE Purchasers and the Affiliates entered into lock-up agreements of the same twenty-month duration. As noted above, SHYD Investment Management Limited had already received Class B ordinary shares from Ostin at nominal cost less than a year before the PIPE, and Defendant Sen personally signed the securities purchase agreement for the PIPE on Ostin's behalf.

78. The PIPE and the accompanying warrant exercise also raised a further indicator of coordination. Together, they resulted in the issuance of 25,548,426 Class A ordinary shares—965,513 from the PIPE itself and 24,582,913 from the warrant exercise—against only 27,430,042 Class A ordinary shares outstanding as of March 21, 2025, meaning the PIPE Purchasers received shares representing approximately 93.1% of Ostin's then-outstanding share count. Despite this dramatic change in nominal share ownership, Ostin's existing management remained in place and in control of the Company's operations. This is inconsistent with an arm's-length transaction in which new, unrelated investors acquire such an overwhelming proportion of a company's equity, which would ordinarily result in those investors installing management of their own choosing.

79. This PIPE was the first step in granting shares to Defendants so that they could initiate the fraud.

**The Registered Direct Offering**

80. On April 9, 2025, the Company's amended and restated 2024 equity incentive plan became effective. Under the amended and restated 2024 equity incentive plan, a total of 1,400,000 ordinary shares of the Company were available for issuance.

81. That same day, the Company's board approved the grant of an aggregate of 500,000 Class B ordinary shares to co-CEO and Director, Tao Ling. The shares vested immediately upon acceptance and were subject to a lock-up period until October 10, 2026.

82. On or about April 15, 2025, while the stock was trading at $0.78-$0.80 per share, a 52-week low, Defendant Sen and his co-conspirators initiated the non-bona fide RDO. Specifically, Sen and Individual 1 (on information and belief, co-CEO Tao Ling) signed a securities purchase agreement on behalf of Ostin that provided "directly to several investors" 9,090,908 class A

ordinary shares and class A ordinary share purchase warrants to purchase up to 90,909,080 class A ordinary shares—all in exchange for a total of $5 million paid by the co-conspirators.

83. Ostin filed the RDO securities purchase agreement in blank form, concealing buyer identities and investment amounts. The RDO securities purchase agreement was filed with the SEC as Exhibit 10.1 to the April 16, 2025 Form 6-K in "Form of" template format. The purchaser signature pages, names, addresses, email addresses, investment amounts, and number-of-shares fields were entirely blank. The bank-account designation for the wire of the $5 million USD purchase price was left blank ("[●]"). Item 601 of Regulation S-K, 17 C.F.R. § 229.601(a), generally requires issuers to file the executed versions of material agreements as exhibits, subject only to the confidential treatment process under Rule 24b-2, which would have created a publicly visible CT Order entry on EDGAR if invoked. The Company did not seek confidential treatment of the buyer identities through that process; it simply filed the securities purchase agreement blank.

84. Under the RDO, the co-conspirators obtained Ostin shares at a deep discount relative to the market price at the time, with the option of purchasing additional shares at an even greater discount through warrant exercises. For instance, under one scenario contemplated by the RDO, the co-conspirators could obtain millions of shares at an average per-share cost of approximately $0.195, which represented a more than 75% discount from Ostin's closing price of $0.80 on April 14, 2025, the date the RDO was finalized.

85. Ostin notified the investing public of the RDO on April 15, 2025, by issuing a press release and filing with the SEC a supplement to the prospectus discussing the RDO ("Prospectus Supplement"). A "prospectus" is a written document that provides all material information about an offering of securities and is the primary sales tool of the issuer and broker-dealers that market the offering for the issuer.

86. Unlike a conventional registered direct offering, the April 15, 2025 RDO was transacted directly with the participating investors and did not involve any placement agent or underwriter. The securities purchase agreement recited that the shares and warrants were sold "directly to several investors," and neither the April 15, 2025 press release nor the Prospectus Supplement identified any broker-dealer as placement agent for the offering. By contrast, when Ostin conducted a separate registered direct offering shortly after the Class Period, announced on June 30, 2025 and closed on or about July 1, 2025, it retained Univest Securities, LLC to act as sole placement agent in exchange for a cash fee of seven percent of the gross proceeds. The absence of any placement agent or other gatekeeper on the April 15, 2025 RDO is consistent with the non-bona fide character of that offering.

87. The RDO securities purchase agreement also included a gag clause requiring that "The Company and each Purchaser shall consult with each other in issuing any other press releases with respect to the transactions contemplated hereby, and neither the Company nor any Purchaser shall issue any such press release nor otherwise make any such public statement without the prior consent of the Company[.]"

88. Defendants Sen and Ling likely signed the RDO securities purchase agreement on behalf of the Company. By accepting and filing the RDO securities purchase agreement in this "Form of" configuration, Defendants Sen and Ling withheld the identities and investment amounts of every buyer from the investing public. Hiding the buyers prevented investors from evaluating whether the placement was arm's-length, related-party, coordinated, or connected to later trading.

**<u>The Fraudulent Promotional Campaign and Rapid Stock Price Increase</u>**

89. By April 2025, Ostin's shares were in decline. On April 14, 2025, Ostin shares hit a low of approximately $0.78 per share, which was the 52-week low for the stock as of that date.

90. At least as early as April 15, 2025—the same day that Ostin publicly announced the RDO and the co-conspirators received their first tranche of Ostin shares—a fraudulent campaign to promote Ostin and increase its stock price began.

91. The fraudulent promotional campaign employed multiple sophisticated tactics designed to create artificial demand for Ostin stock and lure retail investors:

92. Promoters recruited retail investors through social media and induced them to join WhatsApp chat groups labeled as "trading forums" or advisory chats, where OST was relentlessly hyped. WhatsApp is a free application that allows encrypted messaging and Voice over IP service. WhatsApp uses the phone's internet connection to send texts, voice notes, photos, and videos, and to make free international voice and video calls. Throughout these WhatsApp chats, the promoters falsely and misleadingly impersonated actual investment advisors and financial professionals, among others, to advocate for the retail public to purchase Ostin shares. The promoters used the real investment advisors' names, photographs, and credentials stolen from SEC/FINRA-registered firms.

93. The impersonation of real financial professionals was concrete and specific. In at least one Ostin promotion group, the operators used the name and photograph of a principal of a genuine, SEC and FINRA registered financial planning firm located in Manhattan Beach, California, and presented that individual as the group's "site administrator," while additional messages purported to come from a second principal of the same firm. At least one investor who was shown these materials was induced to invest and lost approximately $35,000.

94. Posing as the investment advisors, promoters sent daily messages urging members to "buy more and hold", claiming that "big news is coming" imminently, and explicitly encouraged members to ignore any selling. Some posts even suggested members sell other stock positions to

free up capital to buy Ostin or coordinated group buying at specific times to inflate the price. Many messages were copy-pasted across multiple groups, indicating a coordinated effort rather than organic fan chatter. The promoters further bolstered the illusion by having fake members share screenshots of purported profits and boast about how much money they were making on Ostin – creating peer pressure for others to join in. These tactics were aimed at creating a frenzy of FOMO among retail investors.

95. Certain of the WhatsApp groups were given names designed to borrow the credibility of well-known market commentators. One such group was styled 'Karen Finerman's Free Exchange Group Sharing,' invoking the name of the CNBC personality. Within the groups, promoters posing as fellow investors issued daily buy instructions, claimed to be purchasing Ostin themselves, promised recurring returns on the order of 15 to 25 percent per week, and expelled any member who questioned the promotion or urged caution.

96. Scammers deployed sophisticated AI-generated videos featuring prominent figures including Goldman Sachs Chief Strategist David Kostin, Israeli Prime Minister Benjamin Netanyahu, actress Gal Gadot, Elon Musk, Mark Zuckerberg, and author Tim Ferriss. These deepfakes, images, video, or audio manipulated by AI to convincingly replace a real person's likeness, voice, or actions with someone else's, would appear after clicking sponsored Instagram or Facebook advertisements.

97. The deepfake campaign was tailored to specific national audiences. In Israel, where the promotion was especially intense, the promoters circulated additional deepfake videos impersonating prominent local figures, including the Governor of the Bank of Israel, Amir Yaron, along with the entertainer Eyal Golan, the singer Noa Kirel, the journalist Guy Rolnik, the technology entrepreneur Eyal Waldman, and the businesswoman Shari Arison, among others. The

promoters also impersonated trusted Israeli financial institutions, including the Tel Aviv Stock Exchange, the Israel Securities Authority, Bank Hapoalim, Israel Discount Bank, and Meitav Dash. The videos were localized for their intended audiences, in some instances carrying Russian-language subtitles, and were timed to coincide with current events so as to appear authentic. Israeli victims reported substantial losses, including individual losses of approximately 250,000 and 150,000 shekels.

98. The campaign was similarly localized for investors in the United Kingdom. Sponsored advertisements on Instagram impersonated the well-known British fund manager Anthony Bolton and directed viewers to WhatsApp groups operated by persons posing as licensed advisers. United Kingdom victims reported funding their Ostin purchases through retail investment platforms, including Trading 212 and Robinhood, and reported the fraud to Action Fraud and the Financial Conduct Authority. The same wave of deepfake promotions in the United Kingdom impersonated other prominent financial figures, including a chief economics commentator for the Financial Times.

99. To induce retail investors to purchase Ostin, promoters promised extravagant and guaranteed returns including "expected return of 200-300% in 10-24 trading days due to a major breakthrough … successfully developed a new evaporation process, greatly improved the screen yield and production efficiency … awarded a number of international patents." Promoters also guaranteed that the stock would only need "17-22 trading days to hit the target price of $20-25, achieving an amazing profit return of 170%-250%," and "15-25% weekly returns," "80-150% gains within 4-6 weeks," and characterized Ostin as a "high-yield elite core investment" with profits "up to 300%." These promises violated basic securities laws prohibiting guaranteed return representations and were designed to overcome investors' natural skepticism. Examples include:

May 10, 2025 17:22

**Jennifer Mitchell Reinhart Partners**
Welcome to join us. Our company will release a value investment trading code when the U.S. stock market opens on Monday. It is estimated that you can make a profit of 80%-150% by holding it for 20-30 trading days. Do you have time to receive my information?

May 13, 2025 13:26

**Jennifer Mitchell Reinhart Partners**
Hi! Today, our VIP value investment project OST has achieved a small increase again before the market, which is in sharp contrast to the trend of the overall US stock index. This performance further confirms our previous prediction that the stock will go out of the independent market and continue to maintain its upward momentum. Today I will provide the best buying strategy for OST after 9:50 EST. Please keep in touch to get relevant information and suggestions in time. 🙂🙂

June 5, 2025 22:55

**Jennifer Mitchell Reinhart Partners**
I suggest you raise $100K for trading next week to maximize your gains. What do you think?

June 25, 2025 15:12

**Jennifer Mitchell Reinhart Partners**
OST's stock price is about to break through $9 and will reach $15 on Friday. There are only 6 trading days left to reach our target price of $25. Please buy more now and seize this last low-price buying opportunity. Go, go, go! 🚀🚀🚀

June 26, 2025 18:58

**Jennifer Mitchell Reinhart Partners**
Today, OST was suppressed by short-selling chips, which triggered panic selling in the market, causing the stock price to be impacted and undergo a phased adjustment. Our risk control team has launched an emergency plan and is ready to use $1 billion of institutional reserve funds to push the stock price back above $10, ease market panic, and enhance bullish confidence.



4:29 LTE

Stock Elite Community-Z1
Announcements

3.00
2.50
2.00
1.50
4:19 PM

~Sean Shannon +1 (504) 505-4791
Community admin

On Monday this week, our company notified all investors to increase funds to continue investing in OST. The time and price are the same. Calculated from the opening price of OST on Monday this week, which is $5.92, the stock price has risen to $6.97 so far, with a total increase of 17.7%. If you increased your holdings by $1 million on Monday this week as notified by our company, then so far you have earned $177,000, and this is only a week. The price of OST will continue to rise. Let us wait for it to finally reach around $20-25.
4:31 PM

~Sean Shannon +1 (504) 505-4791
Community admin

When OST's stock price reaches the target price, our company will notify everyone in advance to prepare for sale. But before that, please be patient and hol[d] your OST chips. We suggest that you can sort out your investment portfolio or

You can reply to announcements, but only community admins can send them.

100. The promoters also used pressure tactics to induce Ostin stock purchases. For example, promoters pressured retail investors to send screenshots of their brokerage accounts reflecting the purchase of Ostin shares in the WhatsApp group. If such investors did not "post their positions" in the chats or raised concerns about Ostin, promoters removed the retail investors from the WhatsApp group to maintain the appearance of consensus. Promoters further created the false impression of buying momentum among retail investors in the WhatsApp chats.

101. Promoters also used a deliberate ticker trap, or deliberate confusion with similarly named or similarly tickered entities (OS Therapies Inc. or OSTX, Open Systems Technologies or OST). This tactic exploited retail traders' tendency to rely on ticker symbols without verifying the full company name or industry, especially when trading on emotion and FOMO. For example, promoters would leverage the legitimate, high-impact nature of biotech news from OS Therapies Inc. (OSTX) —such as accelerated FDA trials—to falsely justify Ostin's price rally. This tactic created a false narrative with real-world credibility, preying on inexperienced traders who did not double-check company names. FDA news in biotech often triggers big rallies, so fraudsters exploited this dynamic by blending legitimate biotech milestones (from OSTX) with a completely unrelated hardware stock (OST).

102. Promoters spread fabricated stories that "a major OLED display company" would acquire Ostin at substantial premiums, which they supported with a 20-page report purporting to analyze the global and Chinese markets for Ostin's products. The acquisition rumors had zero factual basis but created urgency and fear of missing out (FOMO) among retail investors.




103. Multiple victims reported that promoters first recommended legitimate stocks that generated small profits, establishing credibility before pivoting to Ostin. This "bait and switch" tactic was designed to lower victims' defenses and establish the promoters as trustworthy sources of investment advice.

104. One especially destructive aspect of the campaign was the difficulty of shorting or hedging against Ostin's share price. The stock had no listed put options, and borrowing shares to short was either impossible or extremely expensive. Shorting a low-float, hard-to-borrow stock like Ostin was so costly and risky that most stayed away, allowing the price to disconnect further from reality. Many retail traders in the groups interpreted the lack of negative commentary or shorting as confirmation that Ostin was a winner.

105. As a result of the promotional campaign, between April 14, 2025, and June 26, 2025, Ostin's stock price increased 1,075% from a closing price of $0.80 on April 14, 2025, to a peak price of $9.40 on June 26, 2025. This price increase occurred despite the significant, nearly

300%, dilution of shares following the issuance of 79,999,990 class A ordinary shares to the co-conspirators, no material corporate developments, earnings surprises, major contract wins, or technological breakthroughs, continued fundamental weakness (declining revenues, mounting losses, negative profit margin, and debt-to-equity ratio of 9.5), and a complete absence of institutional buying interest (institutional ownership remained at 0.1%).

106. Dilutive offerings of this nature typically depress the stock price, but due to the fraudulent campaign, Ostin's stock price increased dramatically.

107. The market capitalization of OST exploded from approximately $22 million to over $1 billion at peak—a 4,445% increase—making OST one of the most-traded stocks on stock-trading platforms including Hargreaves Lansdown, Trading 212, and AJ Bell despite its microscopic actual business operations.

108. During the period of drastic price increase, Ostin did not announce any significant news events that would typically result in a sharp increase in a company's stock, such as a strong earnings announcement or merger announcement.

109. The campaign achieved remarkable geographic reach, with victims spanning the United States, the United Kingdom, Germany, Israel, Canada, and Italy, among others.

110. The FBI Chicago Division has publicly characterized WhatsApp ramp-and-dump operations as routinely conducted through VOIP services that obscure subscriber identity, consistent with the inference that the persons who operated these numbers did so with deliberate anonymity. Subscriber identification of these numbers, and of the WhatsApp accounts associated with the promotion campaign, are discovery-stage subpoena targets for Meta Platforms, Inc., WhatsApp Inc., and the relevant U.S. telecommunications carriers.

111. Screenshots of the WhatsApp promotion groups and of the sponsored advertisements used in these schemes have also been collected in a public, crowdsourced archive established to document them, StopNasdaqChinaFraud.com, which is maintained by the research firm The Bear Cave, and major news organizations that investigated this wave of promotions have reported reviewing the underlying WhatsApp messages.

112. The promotion campaign had the hallmarks of a coordinated manipulation scheme: (a) a low-float stock with no institutional following and no analyst coverage; (b) a price increase of approximately 1,075% in approximately two months without any corresponding fundamental development; (c) the issuance of approximately 80 million newly issued shares to undisclosed buyers at deep discounts through the April 15, 2025 Registered Direct Offering and the May 3, 2025 Warrant Exchange Agreement, which occurred contemporaneously with the promotion campaign; and (d) the industry-wide pattern of structurally identical pump-and-dump schemes.

113. The WhatsApp promotion provides the demand-side mechanism of the pump-and-dump scheme and connects the artificial demand for OST shares to promotion rather than business performance, providing the mechanism by which the holders of discounted shares could sell into an inflated market.

**<u>Defendants Contact Brokers to Further the Scheme</u>**

114. Beginning in or around December 2024, Zhao, claiming to be a financial advisor, began cultivating relationships with brokers based in the U.S. From December 2024 to at least January 2025, Zhao met with various brokers to open brokerage accounts for co-conspirators.

115. Sometime after April 15, 2025, Zhao directly introduced a broker to CC-1 and CC-2, for the purpose of having the brokerage firm open brokerage accounts in their names. Zhao stated that CC-1 and CC-2 had Ostin shares and warrants they wanted to deposit at the brokerage

firm. As part of the account opening process, a broker requested a formal introduction letter from a representative of Ostin for due diligence, given that the transferred Ostin shares were at the time worth millions of dollars. The broker asked Zhao if he knew anyone from Ostin's management team who could confirm that CC-1 and CC-2 were investors. Zhao told the broker to expect contact from the Ostin co-CEO.

116. Sometime after corresponding with Zhao, the broker received an email from Sen, who confirmed that CC-1 and CC-2 were shareholders of Ostin.

117. Between April 24, 2025, and April 25, 2025, CC-1 and CC-2 submitted multiple account opening applications to the brokerage firm.

118. On April 25, 2025, in consultation with Zhao, Sen contacted the broker to get his brokerage firm to open brokerage accounts for CC-1 and CC-2. Specifically, Sen sent an email to the broker stating, "[CC-2] and [CC-1] are both take part into [*sic*] registed [*sic*] direct offering of my company Ostin Technology Ltd. Both guy's [*sic*] shares is non restricted. Here I recommend them to open brokerage account at your side. Please proceed it. If you have any additional question [*sic*] please let me know."

119. After receiving Sen's email, on or about April 25, 2025, the brokerage firm opened a brokerage account in the name of CC-2 (hereafter, the "CC-2 Account"). On or about April 28, 2025, the brokerage firm opened a brokerage account in the name of CC-1 (hereafter, the "CC-1 Account").

120. After the OST shares for CC-1, CC-2, CC-3, and CC-4 were successfully transferred to multiple brokerage firms, Zhao thereafter repeatedly communicated with brokers at the respective brokerage firms with respect to the sale of Ostin shares. For example:

- On or about May 2, 2025, Zhao and CC-4 deposited the 363,636 OST shares obtained via the RDO into the CC-4 Account. Zhao and CC-4 thereafter initiated the sale of all 363,636 shares on or about May 12, 2025, with proceeds totaling approximately $1,509,089.
- On or about May 5, 2025, Zhao and CC-1 deposited the 363,636 OST shares obtained via the RDO into the CC-1 Account. Zhao and CC-1 thereafter initiated the sale of all 363,636 shares on or about May 12, 2025, with proceeds totaling approximately $1,495,137.
- On or about May 5, 2025, Zhao and CC-2 deposited the 436,364 OST shares obtained via the RDO into the CC-2 Account. Zhao and CC-2 thereafter initiated the sale of all 436,364 shares on or about May 12, 2025, with proceeds totaling approximately $1,770,596.
- On or about May 9, 2025, Zhao and CC-3 deposited the 854,545 OST shares obtained via the RDO into the CC-3 Account. Zhao and CC-3 thereafter initiated the sale of all 854,545 shares between on or about May 12, 2025, and on or about May 16, 2025, with proceeds totaling approximately $3,600,716.

**The Warrant Exchange Agreement**

121. Between April 15, 2025, and continuing through May 3, 2025, none of the co-conspirators elected to exercise even a single purchase warrant, even though exercising these purchase warrants would have allowed the co-conspirators to earn substantial profits by purchasing Ostin shares at a steep discount relative to the market price and to sell those shares at significantly higher prices.

122. On May 3, 2025, Sen and Ling, on behalf of Ostin, and each of the co-conspirators executed a "Warrant Exchange Agreement," which further diluted Ostin's preexisting shareholders and ultimately gave the co-conspirators 70,909,082 shares of Ostin. At the time of the Warrant Exchange Agreement, OST was trading at approximately $3.12 per share (the closing price on May 2, 2025), and the 70,909,082 shares provided to the co-conspirators therefore had a market value of approximately $221 million—all provided for zero out-of-pocket cost to the co-conspirators.

123. Between the RDO and the Warrant Exchange Agreement, the co-conspirators were able to obtain 79,999,990 class A ordinary shares of Ostin at an approximate cost of $0.0625 per share, well below Ostin's approximately $3.12 closing price on May 2, 2025, the last trading day before the date of the Warrant Exchange Agreement.

124. Taken together, the RDO and Warrant Exchange Agreement raised the total number of outstanding class A ordinary shares of Ostin from approximately 27.4 million shares to approximately 107.4 million shares—a dilution of nearly 300%. Through these offerings, the co-conspirators became owners of approximately 75% of the outstanding class A ordinary shares of Ostin.

125. On May 29, 2025, eight individuals filed separate Schedule 13G beneficial ownership reports for Ostin, each reporting an identical outstanding-share denominator of 107,430,032 Class A ordinary shares. The eight filers are previously undisclosed Purchasers in the April securities purchase agreement:

- Sheng-Lun Lo (Taiwan, Taipei City) — 7,040,000 shares (6.55%).
- Shih-Song Fong (Taiwan, New Taipei City) — 7,040,000 shares (6.55%).
- Hong-Yuan Fan (Taiwan, New Taipei City) — 7,040,000 shares (6.55%).
- Tzu-Kai Hsiao (Taiwan, New Taipei City) — 6,879,998 shares (6.40%)
- Yen Kai Liao (Taiwan, New Taipei City) — 6,723,920 shares (6.26 %).

- Jones Hendri (Indonesia) — 7,200,002 shares (6.70%).
- Kok Hua Ho (Indonesia) — 7,360,003 shares (6.85%).
- Devid Hon (Indonesia) — 7,519,996 shares (7%).

126. Matching the shares to the eight filers identifies who received the discounted block and supports the inference that the block was coordinated.

127. Pattern markers suggest that the eight May Schedule 13G filers were coordinated rather than independent investors.

128. The eight May 29, 2025, Schedule 13G filings exhibit structural characteristics inconsistent with the conduct of eight independent accredited investors and consistent with a coordinated placement organized by a common arranger acting on behalf of the Company or its insiders:

129. All eight filers held similar amounts and percentages of shares, between 6,723,920 - 7,519,996 shares and 6.26-7%, with three of the filers holding the exact same amount, 7,040,000 shares.

130. All three Indonesian filers (Hendri, Hua Ho, and Hon) are from the same area of Indonesia. All five of the Taiwanese filers (Lo, Fong, Fan, Hsiao, and Liao) are from Taipei City.

131. All eight filers are Southeast Asian; none is a U.S. citizen or U.S. resident; none filed through a broker, nominee, or institutional intermediary; and none filed jointly with any other filer. The May 29, 2025 13Gs are also each filer's first EDGAR submission.

132. All eight 13Gs were submitted to EDGAR on May 29, 2025 in identical XSL-rendered XML format using the identical Schedule 13G template.

133. All eight were bound by the identical short-selling-and-hedging prohibition (Sections 3.2(j) and 4.13) and the identical gag clause (Section 4.4), which is further evidence of common drafting and common documentation.

134. The symmetry in share counts, percentages, geography, filing dates, and documentation supports the inference of a common arranger or undisclosed group.

135. The May filers' failure to report as a group implicates the beneficial-ownership rules. Section 13(d)(3) of the Securities Exchange Act provides that "when two or more persons act as a … group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of" the Section 13(d) reporting framework. SEC Rule 13d-1(k) provides for joint filing of a single Schedule 13G by group members with a Joint Filing Agreement disclosing the group relationship. The eight May cohort filers filed eight separate Schedule 13Gs, none checked the Item 2 group box, none was accompanied by a Joint Filing Agreement, and each answered "Not Applicable" to Item 8. The aggregate combined ownership of the eight filers was 52.86% of the May 12, 2025 outstanding class A shares—amounting to a controlling-block-sized stake that, if held by a Section 13(d) group, would have required a Schedule 13D rather than eight separate Schedule 13Gs.

136. Thus, if the eight April purchasers were not a Section 13(d)(3) group, the structural symmetry across eight geographically dispersed Southeast Asian individuals—and with no broker, no placement agent, no nominee, no documented prior relationship to the Company or its insiders, and no prior EDGAR appearance—cannot be explained by ordinary investor behavior and supports the inference that the eight were placed into the April securities purchase agreement by a common arranger or controlling person acting on the Company's or Defendants Sen and Ling's behalf. On the other hand, if the eight April purchasers did constitute a Section 13(d)(3) group, the failure to file a Schedule 13D, to check the Item 2 group box, and to file a Joint Filing Agreement are themselves disclosure violations under Section 13(d).

137. Despite granting the co-conspirators, including CC-1, CC-2, CC-3, and CC-4, the vast majority of Ostin shares at a fraction of the market price, the terms of the RDO and Warrant Exchange Agreement did not impose any restrictions—such as a stock vesting period or a lock¬ up period—on the co-conspirators' ability to trade their Ostin shares. Consequently, the co-conspirators could sell their shares upon receipt.

138. Thereafter, Zhao told a broker that CC-1 and CC-2 had received new Ostin shares from the Warrant Exchange Agreement. The broker asked Zhao to have an Ostin representative send the broker the total number of Ostin shares outstanding. After the broker contacted Zhao, Sen sent an email to the broker on May 12, 2025, stating; "Out [*sic*] company now outstanding share [*sic*] is 108,130,032. Please see screenshot from transfer agent. Any question please let me know without any hesitate [*sic*]."

139. After the sale of all the RDO-obtained shares on behalf of CC-1, CC-2, CC-3, and CC-4, Zhao and other co-conspirators continued selling Ostin shares obtained as part of the Warrant Exchange Agreement as the artificial pump of the Ostin share price continued. For example:

- On May 13, 2025, Zhao and CC-1 deposited the 2,836,361 OST shares obtained through the Warrant Exchange Agreement into the CC-1 Account. Between May 15, 2025, and continuing through June 10, 2025, Zhao and CC-1 sold 2,027,134 of these shares, with proceeds totaling approximately $10,117,023. When combined with the sale of the RDO shares, the proceeds from the sale of approximately 75% of CC-1's Ostin position totaled $11,612,160 during the period in which the stock was artificially inflated. Zhao and CC-1 sold the remaining 809,227 shares after the drop in Ostin's stock price and received approximately $372,438 from these sales,

bringing the total proceeds from the sale of the OST position to approximately $11,984,598.

- On May 16, 2025, Zhao and CC-3 deposited the 6,665,451 OST shares obtained through the Warrant Exchange Agreement into the CC-3 Account. Zhao and CC-3 then sold 3,908,616 shares between May 19, 2025, and June 24, 2025. The sales of these shares resulted in total proceeds of approximately $23,749,959.

140. With most of the proceeds of the Ostin stock sales, Zhao and his co-conspirators purchased Treasury exchange traded funds (the "Treasury ETFs") and transferred these securities out of the United States to a brokerage firm in Hong Kong. To facilitate these transfers, CC-1, CC-2, CC-3, and CC-4 provided the brokerage firms with account statements for their Hong Kong-based brokerage accounts covering the time period of April 1, 2025, to April 30, 2025. CC-1, CC-2, CC-3, and CC-4 had virtually the same account balances in their Hong Kong-based brokerage accounts during the same period of time.

141. Law enforcement subsequently seized assets traceable to the fraud, including 53,800 shares of USFR, 39,500 shares of TFLO, and 37,100 shares of SHV—Treasury exchange-traded funds purchased with proceeds of the scheme—together with cash totaling approximately $952,150.49.

142. As part of their due diligence, one of the brokers later asked for confirmation that CC-1 and CC-2 were not affiliated persons of Ostin—e.g., officers, directors, or greater than 5% shareholders in Ostin.

143. On June 2, 2025, well into the fraudulent campaign to increase Ostin's share price, Sen wrote to the broker by email that CC-1 and CC-2 were not affiliated with Ostin.

144. In repeatedly working together to allay the broker's concerns about CC-1 and CC2's accounts, Zhao and Sen conspired to create the financial infrastructure to receive the proceeds of fraud and effectuate the securities fraud scheme.

145. The RDO and Warrant Exchange Agreement operated as deceptive devices that were used in furtherance of the conspiracy.

**The Coordinated Selloff and Collapse of Ostin's Stock Price**

146. The fraudulent scheme culminated on June 26, 2025, when Ostin's artificially inflated stock price collapsed within hours, following weeks of coordinated selling by Defendants and their co-conspirators of shares acquired through the RDO and the Warrant Exchange Agreement. In total, the scheme generated more than $110 million in illicit proceeds for Defendants and their co-conspirators.

147. On June 26, 2025, Ostin's stock declined from its intraday high of approximately $9.40 per share to close at approximately $0.55 per share, representing an intraday decline of approximately 94.1%. Ostin lost more than $950 million in market capitalization in a single trading session. Trading volume on June 26, 2025 reached approximately 48.23 million shares, more than *seven times* the Company's average daily trading volume between April 15, 2025 and June 25, 2025 of approximately 6.76 million shares, demonstrating the massively coordinated selling by Defendants and their co-conspirators.

148. Despite the unprecedented collapse in Ostin's stock price, the Company did not disclose the existence of the coordinated promotional campaign, the role of the Registered Direct Offering and the Warrant Exchange Agreement in placing approximately 80 million Class A ordinary shares into the hands of Defendants' co-conspirators, or the coordinated selling that occurred on June 26, 2025. Instead, on June 27, 2025, Ostin issued a press release stating that it

had "no undisclosed material matters" and was "not aware of the specific reasons for the abnormal stock price fluctuations on June 26," while advising investors to rely solely on the Company's SEC filings and public statements.

149. The June 26, 2025 collapse was not attributable to any legitimate business development, earnings announcement, operational setback, or other bona fide market event. Rather, as alleged herein, the collapse resulted from the coordinated liquidation by Defendants and their co-conspirators of shares they had acquired through the Registered Direct Offering and the Warrant Exchange Agreement, thereby revealing that Ostin's extraordinary price appreciation had been artificially created through the coordinated scheme alleged herein rather than by genuine investor demand or improvements in the Company's business, operations, or financial condition.

**The Regulatory Response Validates the Scheme Theory**

150. The pump-and-dump scheme alleged herein was not an isolated incident, but part of a broader pattern of fraud involving Nasdaq-listed, China-based issuers that has drawn sustained regulatory attention. On September 3, 2025, Nasdaq proposed enhanced listing standards targeting the structural vulnerabilities exploited by schemes like the one alleged herein, including a $15 million minimum market value of public float and a $25 million minimum public offering proceeds requirement for companies principally operating in China. The SEC approved the $15 million public float requirement on December 18, 2025, and it became effective January 17, 2026. The SEC separately approved the $25 million minimum offering requirement for China-based issuers on May 14, 2026. In approving that rule, the SEC noted that from August 2022 to April 2025, approximately 70% of Nasdaq's enforcement case referrals to the SEC or FINRA relating to market manipulation involved Chinese companies, even though those companies accounted for less than 10% of Nasdaq listings during that period.

151. On September 5, 2025, the SEC announced the formation of a Cross-Border Task Force within its Division of Enforcement, focused specifically on investigating "pump-and-dump" and "ramp-and-dump" schemes involving foreign-based issuers, with China identified by name as a jurisdiction of heightened risk. The Task Force's mandate explicitly includes heightened scrutiny of "gatekeepers, particularly auditors and underwriters, which help these companies access the U.S. capital markets." Since September 2025, the SEC has suspended trading in the securities of 14 companies, many with ties to mainland China or Hong Kong, due to suspicious trading patterns.

152. In October 2025, FINRA announced that it was investigating broker-dealer firms involved in taking small foreign companies public, compelling firms that served as underwriters, bookrunners, or placement agents in small-cap offerings for companies with overseas operations to provide details about their written supervisory procedures, compliance policies, training materials, and due diligence processes for offerings conducted between January 2023 and September 2025. The investigation focuses on initial public offerings that raised $25 million or less with share prices between $4 and $8—the same range within which Ostin's own April 2022 initial public offering, priced at $4.00 per share, fell.

**Materially False and Misleading Statements Issued During the Class Period**

153. The Class Period begins on April 15, 2025. That same day, Ostin filed its Prospectus Supplement with the SEC in connection with the RDO. The Prospectus Supplement represented that the 36,520,950 Class A Ordinary Shares to be outstanding after the offering assumed "no exercise of the Warrants," and stated, under the heading "Use of Proceeds": "We intend to use the net proceeds from this offering, after deducting our offering expenses, for working capital for general corporate and administrative purposes. We may also use the proceeds to acquire certain assets that our board of directors may deem appropriate for the growth of the Company."

154. The foregoing statements were false and misleading when made. Defendants' representation of the shares to be outstanding "assuming no exercise of the Warrants" was misleading because Defendants had already arranged, as part of the scheme described herein, for the Warrants to be surrendered and exchanged for tens of millions of additional shares: the Warrant Exchange Agreement described below was dated May 3, 2025 — less than three weeks after the RDO closed. Defendants' representation that the offering's proceeds would be used "for working capital for general corporate and administrative purposes" was false because, as Defendants knew at the time, the RDO's actual purpose was to place shares in the hands of fifteen co-conspirators so that the shares could be sold into an artificially inflated market as part of the pump-and-dump scheme described herein.

155. The Prospectus Supplement's "Risk Factor" section stated, in relevant part: "The market price of Ostin's Class A Ordinary Shares has recently declined significantly, and Ostin's Class A Ordinary Shares could be delisted from Nasdaq or trading could be suspended." The Prospectus Supplement further stated: "The trading price for our Class A Ordinary Shares has been, and we expect it to continue to be, volatile. The price at which our Class A Ordinary Shares trade depends upon a number of factors, including our historical and anticipated operating results, our financial condition, announcements of technological developments by us or our competitors, our ability or inability to raise the additional capital we may need and the terms on which we raise it, and general market and economic conditions, most of which are beyond our control."

156. The foregoing statements were false and misleading when made. Defendants attributed the risk of future stock price volatility and potential delisting to generic market factors "beyond our control," when in truth Defendants themselves had already set in motion, and controlled, the very conduct — the non-bona fide RDO, the imminent Warrant Exchange, and the

coordinated social media promotional campaign described herein — that Defendants knew would cause Ostin's stock price to become extremely volatile and would make a subsequent price collapse and trading halt a virtual certainty, not merely a possible future risk unrelated to any known cause.

157. On April 16, 2025, Ostin filed a Form 6-K with the SEC, signed by Defendants Sen and Ling, attaching a press release. The 6-K repeated the Prospectus Supplement's statement that "[a]ggregate gross proceeds to the Company in respect of the offering (assuming no exercise of the Warrants) is expected to be approximately $5.0 million," and stated that "[t]he offering closed on April 15, 2025."

158. The foregoing statements were false and misleading for the reasons stated in ¶154 above.

159. On May 12, 2025, Ostin filed a 6-K attaching the Warrant Exchange Agreement dated May 3, 2025. The 6-K stated that the Exchanged Shares "were issued pursuant to the exemption from the registration requirements of the Securities Act of 1933, as amended . . . , provided by Section 3(a)(9) of the Securities Act." The Warrant Exchange Agreement itself stated that "[b]y friendly negotiation, the Company and the Holders desire to cancel and retire 18,181,816 Existing Warrants . . . in exchange for an aggregate of 70,909,082 Ordinary Shares," and that "[e]ach Holder acknowledges that the terms of the Exchange have been established by negotiation between the Parties."

160. The foregoing statements were false and misleading when made. The Warrant Exchange Agreement was not, in fact, the product of "negotiation" or terms "established by negotiation between the Parties." Rather, it was a mechanism, coordinated among Defendants and the Holders in advance as part of the scheme described herein, to convert the RDO's still-outstanding Warrants into tens of millions of additional freely tradable shares for co-conspirators

who had no bargaining position independent of, or adverse to, Ostin. Defendants' representation that the Exchanged Shares were issued pursuant to the Section 3(a)(9) exemption for exchanges with Ostin's existing security holders was also misleading, because the Holders' status as "existing security holders" was itself created by the non-bona fide RDO described herein, through which Defendants had, weeks earlier, placed the Warrants with the Holders for the purpose of later exchanging them for freely tradable shares outside the registration process.

**The Scheme Concludes**

161. On the morning of June 26, 2025, Ostin touched its peak price of $9.40 per share. Within hours, Ostin's artificially inflated stock price collapsed as Defendants and their co-conspirators engaged in a massive, coordinated selloff of their fraudulently obtained securities following weeks of coordinated selling, resulting in the members of the conspiracy obtaining more than $110 million in illicit proceeds from the sale of Ostin stock

162. Ostin investors suffered significant losses as the stock price closed at $0.55 per share on June 26, 2025—a 94.1% intraday decline from the $9.40 peak. The market capitalization loss exceeded $950 million in a single trading session.

163. Trading volume on June 26, 2025, reached approximately 48.23 million shares—more than seven times the average daily volume of 6.76 million shares—demonstrating the massively coordinated selling by co-conspirators.

164. The crash blindsided retail investors, many of whom had been instructed in fraudulent WhatsApp groups to "hold until July 4" to maximize gains. The speed and severity of the collapse meant that even investors with standing stop-loss orders were unable to exit at anything resembling their intended price, as the stock gapped down through multiple price levels.

165. On June 27, 2025, Ostin issued a press release stating that the company had "no undisclosed material matters, nor is it aware of the specific reasons for the abnormal stock price fluctuations on June 26." Defendants cautioned investors to "rely solely on statements and filings with the U.S. Securities and Exchange Commission issued by the Company itself or its authorized representatives"—misleadingly disclaiming responsibility for the social media promotion that had driven the stock to absurd heights and failing to disclose their perpetration of the fraudulent scheme.

166. Afterwards, Ostin's stock price continued to deteriorate. On June 27, 2025, OST opened at $0.45 and fell to $0.35. On July 3, 2025, the price was $0.16 (98.3% decline from peak) and in August 2025, the price bottomed at $0.08 (99.1% decline from peak).

167. The precipitous decline in Ostin's stock price on June 26, 2025 was not attributable to any legitimate business or financial development, earnings announcement, or other bona fide market event. Rather, it was the direct result of the sudden and massive coordinated selloff by Defendants and their co-conspirators—who dumped the shares they had obtained through the RDO and Warrant Exchange Agreement described herein—which, by its size, timing, and abruptness, revealed to the market for the first time that Ostin's dramatic price appreciation over the preceding two months had been artificially and manipulatively created rather than the product of legitimate investor demand or any genuine improvement in Ostin's business, operations, or financial condition. Until that moment, Defendants had concealed from the market that the majority of Ostin's outstanding shares were held by fifteen co-conspirators who had obtained them for little or no consideration specifically in order to sell them into an artificially inflated market. The trading volume of 48.23 million shares on June 26, 2025—more than seven times Ostin's average daily volume between April 15, 2025 and June 25, 2025—confirms that this was not ordinary trading

activity but the mass liquidation that both caused and, in causing it, revealed the fraudulent scheme. Because Ostin's stock price had been artificially inflated by the concealment of this non-bona fide share issuance and coordinated promotional scheme, the sudden elimination of that concealment through Defendants' and their co-conspirators' selloff caused the artificial inflation to come out of the stock price in a single trading session, directly causing the losses suffered by Plaintiffs and the Class.

## Zhao's Involvement in the PTHL Fraud

168. On or about June 26, 2025, the same day Ostin's stock price collapsed, Zhao joined a virtual messaging platform with brokers entitled [PTHL's symbol]. Thereafter, Zhao facilitated PTHL trading activity at a brokerage firm on behalf of a purported client.

169. PTHL defendants were alleged to have circulated false rumors of an imminent acquisition or partnership to inflate the share price before dumping their holdings and PTHL had already surged over 600% year-to-date.

170. The PTHL stock crashed on or about July 29, 2025, from $31.25 to around $1.65, or approximately 95%, and wiped out over $725 million in market value.

171. The PTHL fraud was part of a broader wave of Chinese micro-cap manipulations that occurred post-Class Period, with at least three similar schemes (involving companies identified in public reports as RYET, RGC, and PHH) following identical patterns.

## Other Relevant Post-Class Period Events

172. On or about July 18, 2025, Ostin received a grand jury subpoena from the United States Attorney's Office for the Eastern District of Virginia requiring the production of a range of documents and communications. Ostin claims to have cooperated with the USAO and undertaken to produce the requested documents.

173. On or about July 28, 2025, Ostin announced a reverse share split in which every twenty-five Ostin class A ordinary shares would be combined into a single Ostin class A ordinary share. After approval by the Company's shareholders on July 17, 2025, this change took effect on August 5, 2025, resulting in the OST stock price going above the $1.00 per share Nasdaq threshold.

174. The reverse split mathematically restored bid-price compliance without restoring underlying equity value, implying this was purely a cosmetic remediation. Considered together with the January 2024 Nasdaq deficiency letter, the post-crash reverse stock split confirms the pattern: the Company was structurally incapable of maintaining Nasdaq listing requirements based on its actual business operations and depended on cosmetic capital-structure maneuvers to maintain its listing.

175. On September 12, 2025, the DOJ unsealed the criminal Indictment charging Lai Kui Sen and Yan Zhao with conspiracy to commit securities fraud and wire fraud, securities fraud under Title 18, wire fraud, and securities fraud under Title 15. The Indictment alleged that Sen and Zhao, along with at least fifteen co-conspirators, orchestrated the pump-and-dump scheme.

176. The investigation was conducted by the Federal Bureau of Investigation ("FBI") Washington Field Office Criminal Division and the SEC Office of Inspector General ("SEC-OIG"), with referral from FINRA's Surveillance and Market Intelligence – Market Abuse Group.

177. That same day, Nasdaq halted trading of Ostin shares following the unsealing of the criminal Indictment. Nasdaq issued a formal request requiring Ostin to provide certain information and/or documents related to the criminal Indictment, as well as Ostin's SEC filings and public disclosures.

178. Trading remains halted indefinitely as of the filing of this Amended Complaint, pending Ostin's full response to Nasdaq's information requests and Nasdaq's determination of whether Ostin meets continued listing standards.

179. On October 21, 2025, Ostin filed a 6-K which announced that it held a Board of Directors meeting and removed Defendant Lai Kui Sen from his roles as Director and co-CEO, due to his indictment for conspiracy to commit securities fraud and wire fraud.

180. Around the same time, Ostin established a special committee of independent Directors to investigate the circumstances of the Indictment and report back to the Board of Directors. Heung Ming Wong, John Carl Mein, and Qiang He, each of whom is a non-management Director, were appointed as members of the committee. Notably, Heung Ming Wong, John Carl Mein, and Qiang He are Defendants in this action.

181. On November 9, 2025, mere weeks after being appointed to the special committee, Heung Ming Wong resigned from being an independent Director.

## SCIENTER ALLEGATIONS

182. During the Class Period, as alleged herein, Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements they issued or disseminated to the investing public, or caused to be issued or disseminated, were materially false and misleading. Defendants knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Ostin, their control over and/or receipt and/or modification of Ostin's allegedly materially misleading statements and documents, and/or their positions with the Company which

made them privy to confidential proprietary information concerning Ostin, participated in the fraudulent scheme alleged herein.

183. Defendant Lai Kui Sen, as co-CEO of Ostin, directly orchestrated and executed the fraudulent scheme. Lai Kui Sen (i) signed the securities purchase agreement for the April 15, 2025 RDO on behalf of Ostin, (ii) signed the Warrant Exchange Agreement on behalf of Ostin, (iii) signed SEC Forms 6-K filed on April 16, 2025, and May 12, 2025, which omitted material facts about the fraudulent scheme, (iv) sent multiple emails to U.S.-based brokers facilitating the opening of brokerage accounts for co-conspirators, including false statements that co-conspirators were not affiliated persons of Ostin, (v) coordinated with Yan Zhao to ensure that co-conspirators received shares and could sell them through U.S. brokerage accounts and (vi) was charged in a four-count criminal indictment with orchestrating the pump-and-dump scheme.

184. Lai Kui Sen's false statements to brokers that co-conspirators were not "affiliated persons" of Ostin—when in fact they collectively owned 75% of the Company's shares—demonstrate actual knowledge of the fraud. Lai Kui Sen knew that securities laws require disclosure of sales by affiliates and impose restrictions on such sales. By falsely representing that the co-conspirators were not affiliates, Lai Kui Sen deliberately attempted to facilitate their sales without triggering regulatory scrutiny.

185. Lai Kui Sen's direct participation in every critical aspect of the fraudulent scheme—from signing the offering documents to facilitating brokerage accounts to making false statements to brokers—establishes beyond question that he acted with actual knowledge of the fraud and with intent to deceive investors.

186. The fact that the U.S. DOJ determined there was probable cause to charge Lai Kui Sen with criminal securities fraud and conspiracy is powerful evidence of his scienter. Federal

prosecutors must present evidence to a grand jury, and a grand jury must find probable cause that a crime was committed. The grand jury's decision to indict Lai Kui Sen on four counts of securities fraud and related offenses strongly supports an inference of scienter.

187. On October 21, 2025, Ostin filed a 6-K which confirmed that Lai Kui Sen was removed from his roles as Director and Co-CEO due to his indictment for conspiracy to commit securities fraud and wire fraud. Lai Kui Sen's termination as a direct result of his role in the fraud contributes to the compelling inference of scienter. The timing of Heung Ming Wong's resignation, mere weeks after being appointed to the special committee formed to investigate the fraud, further supports the inference of scienter.

188. The Company entered into purchase agreements in the months leading up to the Class Period to sell 965,513 class A ordinary shares and 24,582,913 class A ordinary shares from warrants to the PIPE Purchasers, and granted 500,000 Class B ordinary shares to Co-CEO and Director, Tao Ling. Notably, the Class A and Class B ordinary shares *were subject to lock-up agreements*. However, Ostin issued almost 80 million shares to the co-conspirators without a lock-up agreement, far more than the 965,000, 24,000,000, and 500,000 shares that *were subject to lock-up agreements*. This supports an inference of scienter, as Defendants knowingly issued the shares without a lock-up agreement, even though the co-conspirators receiving them were granted approximately 75% of shares outstanding, to conduct the scheme.

189. The sheer magnitude of the dilution and the absurd terms of the securities offerings establish that Defendants knew they were engaging in fraud: (i) the co-conspirators received 80 million shares (75% of the Company's outstanding shares) at an average cost of $0.0625 per share, (ii) over 70 million of these shares were provided for zero cash consideration through the Warrant Exchange Agreement, (iii) no legitimate business purpose justified providing 75% of the

Company's shares to 15 investors at pennies per share, and (iv) the offering prices represented an 82-91% discount to market prices at various times during the scheme.

190. The fraudulent promotional campaign began on April 15, 2025— the same day that Ostin publicly announced the RDO and the co-conspirators received their first tranche of Ostin shares. This precise timing demonstrates premeditated coordination between the securities offerings and the market manipulation campaign, establishing that Defendants knew they were engaging in a fraudulent pump-and-dump scheme.

191. During the period when Ostin's stock price increased 1,075%, the Company announced no significant business developments that would justify even a fraction of that increase. Ostin did not announce any significant business catalysts, new products, strategic partnerships, technological breakthroughs, or new customers. The complete absence of any legitimate reason for the stock price increase, combined with Defendants' knowledge of the fraudulent promotional campaign and the massive selling by insiders, establishes that Defendants knew the stock price was being artificially manipulated.

192. Additionally, between April 15, 2025, and continuing through May 3, 2025, none of the co-conspirators elected to exercise even a single purchase warrant, despite the fact that the stock price increased from $0.80 to over $3.00, as exercising these purchase warrants would have allowed the co-conspirators to earn substantial profits by purchasing Ostin's shares at a steep discount relative to the market price and then selling those shares at significantly higher prices. This suggests that the warrant exchange was pre-planned as part of the scheme, rather than being a legitimate economic transaction, and that Defendants knew the purpose was to provide co-conspirators with additional shares to dump at inflated prices. This contributes to the inference of scienter.

193. The eight May 29, 2025, Schedule 13G filings exhibit pattern markers of coordinated "group" action. The structural makeup of the eight Schedule 13G filings—the symmetry in share counts, percentages, geography, filing dates, and documentation — is consistent only with coordinated action by a group of buyers acting in concert under a common arranger acting on behalf of the Company or Defendants Sen and Ling. This satisfies the threshold for inferring "group" action within the meaning of Section 13(d)(3) of the Exchange Act and supports an inference of scienter.

194. The fraudulent scheme alleged herein involved Ostin's core operations—specifically, the issuance and sale of the Company's own securities. The Individual Defendants, as officers and directors of Ostin, necessarily had detailed knowledge about the Company's securities offerings, share issuances, and capital-raising activities. The core operations doctrine establishes a strong inference that the Individual Defendants knew or recklessly disregarded the fraudulent nature of these transactions.

195. Defendants knew or recklessly disregarded that Zhao had participated in similar pump-and-dump schemes previously. Zhao had used the same brokers in the past to facilitate sales of other pump-and-dump schemes involving at least two other Chinese companies, JYD and CLEU, whose stocks also crashed after Zhao directed sales through these brokers—establishing a pattern of serial fraud. Specifically, the Indictment alleges that in or around March 2025, Zhao introduced a broker at the same New Jersey-based brokerage firm that had facilitated CC-1's and CC-2's Ostin accounts to a client who owned JYD shares, and that the broker transferred the client's JYD shares into an account at that firm; JYD's stock price then crashed the following month. The Indictment further alleges that Zhao directed sales of his clients' CLEU and JYD stock to brokers at the same New York-based brokerage firm that had facilitated CC-3's and CC-4's

Ostin accounts, including at or around the time CLEU's and JYD's stock prices were crashing. In fact, Zhao also participated in a pump-and-dump scheme, involving PTHL, with the same brokers after he completed the Ostin pump-and-dump.

196. In Zhao's JYD pump-and-dump scheme, PIPE investors of JYD ordinary shares were actually related parties to JYD and its subsidiary. In other words, JYD was dealing ordinary shares to itself without disclosing that information to the public and SEC.

197. Similarly, on February 10, 2025, mere months before the Class Period, Ostin announced that it entered into a securities purchase agreement with PIPE investors, where certain affiliated shareholders of the Company entered into an affiliate lock-up agreement, pursuant to which, the affiliates agreed not to offer or sell any class A ordinary shares for twenty months following the closing date of the PIPE. However, the affiliates only had close to 300 thousand class A ordinary shares after the PIPE deal.

198. Tellingly, Defendants still entered into purchase agreements that would dilute shares and actually received votes from the PIPE Purchasers to issue those shares, even though the PIPE Purchasers would lose control and their shares would be diluted.

199. The fact that the pump-and-dump scheme mirrors Zhao's previous schemes contributes to the inference of scienter.

200. The use of Streeterville gives a strong inference of scienter as well. Defendants knew or recklessly disregarded Streeterville and Fife's history of fraud. Specifically, according to a *Financial Times* article, Fife had a now-settled fraud case involving "dozens of phony family trusts" and "even more devious schemes" that occurred in 2007. In 2020, the SEC described Fife as a "recidivist violator of the federal securities laws". The SEC alleged that Fife and his companies made more than $60 million in profits between 2015 and 2019 from a "very lucrative" model:

buying "convertible promissory notes" that converted into newly issued shares, which they would "rapidly sell . . . into the public market at a profit." Defendants knowingly dealing with Streeterville and Fife, a "recidivist violator of the federal securities laws," gives an inference of scienter.

201. Additionally, Audit Alliance, Ostin's independent registered public accounting firm, was the subject of a PCAOB inspection report dated September 27, 2024. The report covered three audits from fiscal year 2022 and found deficiencies in 2 of the 3 audits reviewed. Specifically, the PCAOB found that in one audit, the firm identified a fraud risk in revenue recognition but did not adequately test it, and in the other audit, found a reporting error. Ostin's previous independent registered public accounting firm, TPS Thayer, was sanctioned for failing to appropriately plan five audits of two public companies—one of which was Ostin and the other of which was Huadi International Group Co., Ltd.—and for failing to reasonably supervise an unregistered public accounting firm – also based in China – that played a substantial role in those audits. PCAOB censured TPS Thayer, imposed a civil money penalty in the amount of $100,000, and required TPS Thayer to undertake certain contingent remedial actions. Defendants' willingness to repeatedly employ auditors with shoddy audit practices supports an inference of scienter.

202. Defendants had both motive and opportunity to commit the fraud alleged herein.

203. Lai Kui Sen and the other Individual Defendants had motive to inflate Ostin's stock price through fraud because (i) Ostin was financially distressed with declining revenues, mounting losses, and chronic compliance issues, (ii) the Company faced potential delisting from Nasdaq for failing to maintain the minimum $1.00 bid price and had already completed a reverse stock split, (iii) inflating the stock price through fraud would allow insiders and co-conspirators to sell shares

at artificially high prices, generating tens of millions of dollars in proceeds, and (iv) the scheme ultimately generated over $110 million in illicit proceeds for Lai Kui Sen and his co-conspirators.

204. Defendants had opportunity to commit the fraud because (i) as officers and directors of Ostin, they controlled the Company's securities offerings and SEC filings, (ii) they had the authority to execute securities purchase agreements and warrant exchange agreements on behalf of Ostin, (iii) they had access to material non-public information about the Company's financial condition and operations, (iv) they controlled the timing and terms of securities offerings, and (v) they had relationships with U.S.-based brokers that they exploited to facilitate the scheme.

205. The combination of motive and opportunity, together with the other facts alleged herein, establishes a strong inference of scienter.

206. The circumstances of TPS Thayer's departure reinforce this inference. In the Form 6-K furnished on October 4, 2024 reporting the change of auditor, which was signed by Defendant Ling, Ostin represented that there had been no disagreements with TPS Thayer and no "reportable events" within the meaning of Item 304(a)(1)(v) of Regulation S-K, and TPS Thayer furnished a letter stating that it agreed with those statements. That representation of a routine, dispute-free transition did not disclose the supervisory and disclosure failures the PCAOB later sanctioned: TPS Thayer's unsupervised use of the unregistered Firm A on the Ostin audits and its failure to report that participation on Form AP.

207. Audit Alliance's inspection history shows that it identified fraud risks in issuer revenue and digital assets and then failed to perform the procedures necessary to test them, and that at least one such failure was followed by an admitted material misstatement. That history, together with the red flags at Ostin described above, supports a strong inference that Audit Alliance

acted with at least reckless disregard in associating a clean opinion with Ostin's financial statements.

208. The Auditor Defendants' scienter also follows from their repeated service as gatekeepers for China-based, Nasdaq-listed issuers used as vehicles for market manipulation, including Huadi and CLEU, and from the compensation they received for their work.

209. The audits concerned Ostin's core financial reporting, and the Auditor Defendants had detailed knowledge of and access to the Company's books, records, and personnel.

210. The Auditor Defendants were compensated, directly or indirectly, for their audit and services related to Ostin.

## SCHEME LIABILITY

211. In addition to making false and misleading statements throughout the Class Period, Defendants also employed a scheme to defraud investors and engaged in practices that operated as a fraud upon persons who purchased Ostin securities by artificially inflating the price and trading volume of Ostin's stock. Specifically, beginning in April 2025, Defendants orchestrated a fraudulent pump-and-dump scheme so that Defendants and their co-conspirators could obtain more than $110 million in illicit proceeds from the sale of Ostin stock and victimize unwitting investors.

212. The scheme included a fraudulent campaign to artificially inflate the price and trading volume of Ostin stock through social media and messaging service applications, including promotions that impersonated actual investment advisors and financial professionals, solely to maximize the stock price and proceeds that Defendants would obtain.

213. Defendants undertook actions to further this scheme including engineering a fraudulent sequence of securities offerings to place the majority of Ostin shares in the hands of fifteen co-conspirators for heavily discounted or no remuneration. Specifically, the RDO and

Warrant Exchange Agreement operated as deceptive devices that were used in furtherance of the scheme.

214. Defendants also facilitated the opening of brokerage accounts on behalf of co-conspirators, which were used to sell the millions of Ostin shares that were obtained through non-bona fide securities offerings to investors at substantial profit. In repeatedly working to allay broker concerns about the co-conspirator's accounts, Defendants conspired to create the financial infrastructure to receive the proceeds of the fraud and effectuate the scheme.

215. Defendants never willingly disclosed their fraudulent scheme to the public. Instead, it was revealed when Ostin's stock price dropped from its peak $9.40 per share to close the day at $0.55 per share, and Ostin's market capitalization dropped by over $950 million in a single day, a greater than 94% reduction. Defendants continued to deny having any knowledge and concealed the scheme until the DOJ unsealed the criminal Indictment months later, forcing Defendants to acknowledge the scheme.

216. The conduct underlying Defendants' scheme comprised deceptive acts separate from, and in addition to, Defendants' false and misleading statements throughout the Class Period. Without those deceptive acts, Defendants' fraud could not have been effectuated, and thus comprised a device, scheme, or artifice to defraud under SEC Rule 10b-5(a) and acts, practices, or a course of business which operated as a fraud or deceit upon the market under SEC Rule 10b-5(c).

## **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

217. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the Company's securities during the Class Period (the "Class"); and were damaged upon

the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

218. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ostin securities were actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Ostin or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

219. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

220. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

221. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Ostin;
- whether the Individual Defendants caused Ostin to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Ostin securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

222. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

223. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Ostin securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the Nasdaq and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased, acquired and/or sold Ostin securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

224. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

225. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

226. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

227. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

228. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Ostin securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Ostin securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

229. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Ostin securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Ostin's finances and business prospects.

230. By virtue of their positions at Ostin, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose

such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

231. Additionally, as alleged further *supra*, Defendants' pump-and-dump scheme to artificially inflate the price and trading volume of Ostin's stock by engineering a fraudulent sequence of securities offerings comprised deceptive acts separate from, and in addition to, Defendants' false and misleading statements throughout the Class Period. Without those deceptive acts, Defendants' fraud could not have been effectuated, and thus comprised a device, scheme, or artifice to defraud under Rule 10b-5(a) and acts, practices, or a course of business which operated as a fraud or deceit upon the market under Rule 10b-5(c).

232. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Ostin, the Individual Defendants had knowledge of the details of Ostin's internal affairs.

233. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Ostin. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Ostin's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of

Ostin securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Ostin's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Ostin securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants and were damaged thereby.

234. During the Class Period, Ostin securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Ostin securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Ostin securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Ostin securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

235. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

236. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the revelation, through the June 26, 2025 collapse in Ostin's stock price and trading volume described herein, that

Ostin's stock price had been artificially inflated by Defendants' non-bona fide securities offerings and coordinated pump-and-dump scheme.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

237. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

238. During the Class Period, the Individual Defendants participated in the operation and management of Ostin, and conducted and participated, directly and indirectly, in the conduct of Ostin's business affairs. Because of their senior positions, they knew the adverse non-public information about Ostin's misstatement of income and expenses and false financial statements.

239. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Ostin's financial condition and results of operations, and to correct promptly any public statements issued by Ostin which had become materially false or misleading.

240. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Ostin disseminated in the marketplace during the Class Period concerning Ostin's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Ostin to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Ostin within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Ostin securities.

241. Each of the Individual Defendants, therefore, acted as a controlling person of Ostin. By reason of their senior management positions and/or being directors of Ostin, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Ostin to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Ostin and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

242. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Ostin.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class Representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

Dated: July 13, 2026

*/s/ Tamar A. Weinrib*

**POMERANTZ, LLP**
Jeremy A. Lieberman
Tamar Weinrib
Justin Krumper
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
taweinrib@pomlaw.com
jkrumper@pomlaw.com

*/s/ Andrew Robertson*

**MORRIS KANDINOV LLP**
Aaron T. Morris
Andrew W. Robertson
William H. Spruance III
305 Broadway, 7th Floor
New York, NY 10007
(212) 431-7473
aaron@moka.law
andrew@moka.law
william@moka.law

**MORRIS KANDINOV LLP**
Leonid Kandinov
550 West B Street, 4th Floor
San Diego, CA 92101
(619) 780-3993
leo@moka.law

*/s/ John T. Jasnoch*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
John T. Jasnoch
Mollie Chadwick
600 W. Broadway, Suite 3300

San Diego, CA 92101
(619) 233-4565
jjasnoch@scott-scott.com
mchadwick@scott-scott.com

**HIGHFUL LAW PLLC**
Tyler Highful
5900 Balcones Drive, Suite 100
Austin, TX 78731
(512) 666-7426
tyler@highful.com

*Attorneys for Plaintiffs*